**UNITED STATES DISTRCT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CARLOS SANTOS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. 15 C 5325 |
| v. | ) | Hon. Marvin E. Aspen |
| | ) | |
| TARRY WILLIAMS, Warden, | ) | |
| Stateville Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Presently before us is Carlos Santos' petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2254.  For the reasons set forth below, we deny the petition in part and determine an

evidentiary hearing and appointment of counsel are necessary to resolve Santos' remaining

claim.

### BACKGROUND AND PROCEDURAL HISTORY

**I.     Santos' Trial and Conviction**

Following a jury trial in the Circuit Court of Cook County, Illinois, Santos was convicted

of felony first degree murder, 720 ILCS 5/9–1(a)(3), and personal discharge of a firearm during

the course of the crime.  *See People v. Santos*, 2014 IL App (1st) 123129–U, ¶ 14 (1st Dist.

Dec. 23, 2014) (Postconviction Order).  The felony murder conviction was predicated on charges

of attempted aggravating kidnapping, attempted residential burglary, and attempted aggravated

unlawful restraint.  (Direct Appeal Order, *People v. Santos*, No. 02 CR 15262 (1st Dist. 2009), State Ct. R., Ex. A (Dkt. No. 18–1) at 2.)  He was sentenced to 55 years in prison.  (*Id.*)

Santos' conviction stemmed from a May 3, 2002 attempt to collect a drug debt that resulted in the shooting death of Jeffrey Smith.  *Santos*, 2014 IL App (1st) 123129–U, ¶ 4. Santos, along with his brother-in-law Alexander Valencia, sold a kilogram of heroin worth $70,000 to the victim's father, James Smith.  *Id.*  James Smith took the drugs but never paid Santos and Valencia.  *Id.*  After several unsuccessful attempts to collect the money Smith owed for the drugs, and after Smith threatened to kill them if they came calling again, they hired two Cook County Sheriff deputies, John Lavelle and Estaban Perkins, to help them collect on the debt.  *Id.*  On May 3, 2002, Santos, Valencia, Lavelle, and Perkins traveled to the Smith home in two cars.  *Id.*  Valencia stayed in one car, while Santos, Lavelle, and Perkins approached the home.  *Id.*  Jeffrey Smith, James' adult son, answered the door armed with a "big gun."  (Direct Appeal Order at 5.)  Perkins ran back to Valencia's car and drove away, while Santos and Lavelle took cover.  *Santos*, 2014 IL App (1st) 123129–U, ¶ 5.  A shootout ensued, and Jeffrey Smith died two days later from gunshot wounds.  *Id.*  Lavelle fired the fatal shots.  (Direct Appeal Order at 5.)  Santos was also armed, and he told police that although his gun did not work, he pulled the slide and the gun discharged at least once.  (*Id.*)

Santos and Valencia were tried jointly before separate juries.  Santos' jury began deliberating at 6:35 p.m. on September 26, 2006.  (Trial Tr., State Ct. R., Ex. AA (Dkt. No. 18–27) at OOO 196.)  At some point during the evening, the jury sent a note to the judge requesting a dictionary.  (Direct Appeal Order at 18; Trial Tr., State Ct. R., Ex. BB (Dkt. No. 18–28) at TTT 21.)  The trial judge—off the record and without informing either the defense or prosecution—directed that a *Webster's* dictionary be delivered to the jury.  (*Id.*)  The

parties were called into court later that evening, where they were notified, again off the record, that the jury was provided the dictionary. (Direct Appeal Order at 18; *see also* Aff. in Support of Mot. for New Tr., State Ct. R., Ex. EE (Dkt. No. 18-31) at C 238–39.) Defense counsel moved to restrict the jury from further use of the dictionary, and the jury was not given the dictionary the following day as they continued their deliberations on September 27, 2006. (*Id.* at C 239.) At 12:15 p.m. on September 27, 2006, the jury returned a guilty verdict. (Trial Tr., State Ct. R., Ex. BB (Dkt. No. 18–28) at PPP 5.) Santos moved for a new trial on several grounds, including that the judge improperly provided the dictionary. (Am. Mot. for New Tr., State Ct. R., Ex. EE (Dkt. No. 18–31) at C 238–39, 240–43.) The trial judge denied the motion on March 1, 2007. (Trial Tr., State Ct. R., Ex. BB (Dkt. No. 18–28) at TTT 8–22.)

## II.  Direct Appeal

Santos appealed his conviction to the Illinois Appellate Court. Santos argued, among other things, that the trial judge violated his constitutional right to be present by communicating with the jury outside the presence of Santos or his counsel, and by supplying the jurors with a dictionary without consulting with the defense, inquiring as to why the jury asked for the dictionary, or determining whether it influenced their deliberations. (Direct Appeal Order at 18.) The Illinois Appellate Court rejected Santos' claim and upheld the conviction on July 14, 2009. (*Id.* at 20.) Santos then filed a petition for rehearing, arguing that, under state and federal law, the appellate court erred when it held the trial court did not abuse its discretion in communicating *ex parte* with the jury and in providing the jury a dictionary without defendant being present or having the opportunity to object or otherwise respond. (Direct Appeal Pet. for Reh'g, State Ct. R., Ex. F (Dkt. No. 18–6).) The Illinois Appellate Court summarily denied the petition for rehearing. (Pet. for Reh'g Order, State Ct. R., Ex. G (Dkt. No. 18–7).) Santos renewed his

objection to the Illinois Supreme Court by filing a Petition for Leave to Appeal ("PLA"), and his petition was also summarily denied on March 24, 2010. (Direct Appeal PLA Order, State Ct. R., Ex. I (Dkt. No. 18–9).)

## III. State Post-Conviction Proceedings

Santos then filed a postconviction petition, claiming that the State violated his due process rights under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963) by withholding material, exculpatory evidence consisting of an audio-recorded police interview with his mother, Aidali Oquendo. *Santos*, 2014 IL App (1st) 123129–U, ¶ 16. Oquendo retained a lawyer and went to the police station when she learned of Santos' arrest, and police questioned Oquendo in the presence of her lawyer while she was at the station. *Id.* ¶ 11.

Santos argued that part of the interview was recorded without his knowledge, and the recording documented Detective John Trahanas threatening his mother. *Id.* Specifically, Santos alleged that detectives told Oquendo that "if she did not answer their questions she would be charged with a crime." *Id.* ¶ 16. Santos further contended that the threats to Oquendo corroborated his allegations that detectives threatened him prior to his own video-recorded interrogation. *Id.* Before trial, Santos moved to suppress his video-recorded statement to police. *Id.* ¶¶ 10–13. He claimed that he was coerced into making the statement by detectives, who told him that if he refused to speak with them, "members of his family would be arrested," but if he "cooperate[d]" they would "let [him] go" and would not press charges against his family. *Id.* ¶ 10. Oquendo testified during the suppression hearing, but she did not mention being threatened by detectives. *Id.* ¶ 11. Santos contended that had he known about the audiotape of his mother's interrogation, he could have impeached Detective Trahanas' testimony at the

hearing that no officers ever told Santos that "if he didn't help[,] his family would get locked up and that he would go to jail for life" or that "members of his family would be arrested." *Id.* ¶ 12.

The state circuit court dismissed Santos' postconviction petition on December 23, 2014. *Id.* ¶ 17. The Illinois Appellate Court denied Santos' appeal and affirmed the dismissal. *Id.* ¶ 24. Santos filed a Petition for Leave to Appeal to the Illinois Supreme Court, which was summarily denied on May 27, 2015. (Postconviction PLA Order, State Ct. R., Ex. P (Dkt. No. 18–16).)

## IV. Federal Habeas Petition

Santos filed the instant federal habeas petition on June 16, 2015, asserting two grounds for relief, both of which were raised in state court and were adjudicated on the merits after a full round of state-court appellate review either on direct appeal or through post-conviction review. First, Santos contends the State violated his Fifth, Sixth, and Fourteenth Amendment rights because he was excluded from being present at a critical stage of his trial when the trial judge communicated *ex parte* with the deliberating jury and provided them with a dictionary. (Pet. at 5, 11–13.) Second, Santos claims the State denied his right to due process by failing to disclose material evidence in the form of an audiotape of the interview between the police and Oquendo in violation of *Brady v. Maryland*. (Pet. at 5, 14–16.) We may consider these claims on the merits as Santos exhausted his state court remedies. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 1732 (1999); *Farrell v. Lane*, 939 F.2d 409, 411 (7th Cir. 1991).

## STANDARD OF REVIEW

To obtain habeas relief, a petitioner must establish that his state conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68, 112 S. Ct. 475, 480 (1991). Our review is guided by the Antiterrorism and Effective Death

Penalty Act of 1996, 28 U.S.C. § 2254 ("AEDPA"). *Hall v. Zenk*, 692 F.3d 793, 797

(7th Cir. 2012). Under AEDPA, a habeas petitioner must establish the proceedings in state court

resulted in a decision that was (1) "contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States" or

that (2) "resulted in a decision that was based on an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d);

*Williams v. Taylor*, 529 U.S. 363, 404–05, 120 S. Ct. 1495, 1519 (2000); *Morgan v. Hardy*,

662 F.3d 790, 797 (7th Cir. 2011). Determinations of factual issues made by a state court are

presumed correct, and the petitioner bears the burden of rebutting this presumption with clear

and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Sumner v. Mata*, 449 U.S. 539, 547,

101 S. Ct. 764, 769–70 (1981).

First, a state court's decision is contrary to clearly established Supreme Court precedent

"if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

question of law" or "if the state court confronts facts that are materially indistinguishable from a

relevant Supreme Court precedent and arrives at a result opposite to [it]." *Williams*,

529 U.S. at 405, 120 S. Ct. at 1519; *see also Morgan*, 662 F.3d at 797; *Woods v. McBride*,

430 F.3d 813, 816–17 (7th Cir. 2005).

Second, a state court's decision is an "unreasonable application" of clearly established

Supreme Court precedent "if the state court identifies the correct governing legal rule from [the

Supreme] Court's cases but unreasonably applies it to the facts of a particular prisoner's case" or

"if the state court either unreasonably extends a legal principle from [Supreme Court] precedent

to a new context where it should not apply or unreasonably refuses to extend that principle to a

new context where it should apply." *Williams*, 529 U.S. at 407–08, 120 S. Ct. at 1521;

*Morgan*, 662 F.3d at 797. A state court's application of Supreme Court precedent must be more than incorrect or erroneous; it must be "objectively" unreasonable. *Williams*, 529 U.S. at 410, 120 S. Ct. at 1522 ("[A] federal habeas court may not issue the writ simply because that court concludes . . . that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."); *see also Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770, 785 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of that decision."). Under this standard, to be unreasonable, the decision of the state court must lie "well outside the boundaries of permissible differences of opinion." *Watson v. Anglin*, 560 F.3d 687, 690 (7th Cir. 2009) (quoting *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002)); *see also Henderson v. Briely*, 354 F.3d 907, 909 (7th Cir. 2004) ("[T]he question before a federal court on collateral review . . . is only whether the state court's decision was so far out-of-bounds as to be 'unreasonable.'").

## ANALYSIS

### I. CLAIM ONE: INTERFERENCE WITH JURY DELIBERATIONS

Santos first contends the government deprived him of his right to assistance of counsel, the right to be present during all critical stages of his trial, and his right to due process under the Fifth, Sixth, and Fourteenth Amendments. (Pet. at 11–12.) Santos argues that the state trial court erred in answering the jury's note and providing the jury a dictionary without informing Santos or his counsel, without recording the proceedings, and without inquiring as to why the jury requested the dictionary or what words they sought to define. (*Id.* at 5, 11–13.) He claims he was prejudiced by the errors because the dictionary was an extraneous source of information the jury may have relied upon to define legal terms that influenced guilt or innocence, or "to

construct [their] own definition of legal terms that do not accurately or fairly reflect applicable law." (*Id.* at 12.)  He also argues that he was prejudiced because he was not afforded an opportunity to inquire as to the reason the jury requested the dictionary or to investigate whether it resulted in the jury applying incorrect law.  (*Id.* at 12–13.)

On direct appeal, the Illinois Appellate Court applied an abuse of discretion standard and held the trial court "did not err in providing the jury with a dictionary as that decision was well within the judge's discretion." (Direct Appeal Order at 19.)  It similarly held that "the trial court did not err in failing to inquire as to what words the jury sought to define . . . [because] that decision was well within the discretion of the trial court." (*Id.*)  Three issues flow from the appellate court's decision and are raised by Santos' petition:  (1) whether the *ex parte* communication between the judge and jury violated Santos' constitutional rights to counsel and to be present at all critical stages of the proceedings; (2) whether his constitutional rights were violated by allowing the jury to consider information outside the evidence presented at trial and apart from their own beliefs and experiences; and (3) whether the alleged errors caused actual prejudice.

A.      ***Ex Parte* Communication With the Jury**

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right . . . to be confronted with the witnesses against him," including the right to be present in the courtroom at all critical stages of the criminal proceedings.  U.S. Const. amend. VI; *Illinois v. Allen*, 397 U.S. 337, 338, 90 S. Ct. 1057, 1058 (1970); *see also Rushen v. Spain*, 464 U.S. 114, 117, 104 S. Ct. 453, 455 (1983) ("Our cases recognize that the right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant."); *Moore v. Knight*, 368 F.3d 936, 940 (7th Cir. 2004);

*Ellsworth v. Levenhagen*, 248 F.3d 634, 640 (7th Cir. 2001). "The Due Process Clause supplements this right by protecting the defendant's right to be present during some stages of the trial where the defendant's ability to confront a witness against him is not in question—*ex parte* communications between the judge and jury fall into this category." *Moore*, 368 F.3d at 940 (citing *United States v. Gagnon*, 470 U.S. 522, 526, 105 S. Ct. 1482, 1484 (1985)).

However, the "mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right," nor does a defendant have "a constitutional right to be present at every interaction between a judge and a juror" or "to have a court reporter transcribe every such communication." *Gagnon*, 470 U.S. at 526, 105 S. Ct. at 1484 (quoting *Rushen*, 464 U.S. at 125–26, 104 S. Ct. at 459 (Stevens, J., concurring in judgment)); *see also Ellsworth*, 248 F.3d at 640 ("But the constitutional right to presence is not implicated per se by a judge's *ex parte* communication with the jury during deliberations."). Rather, a defendant has "a due process right to be present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge,'" but only "'to the extent that a fair and just hearing would be thwarted by his absence.'" *Gagnon*, 470 U.S. at 526, 105 S. Ct. at 1484 (quoting *Snyder v. Com. of Mass.*, 291 U.S. 97, 108, 54 S. Ct. 330, 333 (1934) (overruled on other grounds)). "Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S. Ct. 2658, 2667 (1987).

Accordingly, the question is whether "the *ex parte* communication had a prejudicial effect on the defendant, and so infected the trial process as to make the trial as a whole fundamentally unfair." *Ellsworth*, 248 F.3d at 640 (internal quotations and citations omitted);

*see also Snyder*, 291 U.S. at 115, 54 S. Ct. at 336 (explaining that the "justice or injustice of [the defendant's] exclusion must be determined in the light of the whole record"). "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." *Remmer v. United States*, 347 U.S. 227, 229, 74 S. Ct. 450, 450 (1954); *accord. Hall*, 692 F.3d at 802 ("[T]he *Remmer* presumption is clearly established federal law as defined by AEDPA."). "The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Remmer*, 347 U.S. at 229, 74 S. Ct. at 450. Generally, "[i]t is well-settled that once the jury has begun to deliberate, counsel must be given an opportunity to be heard before the trial judge responds to any juror inquiry," and any discussion "concerning the jury inquiry and the court's response must take place on the record in the presence of the defendant." *United States v. Smith*, 31 F.3d 469, 471 (7th Cir. 1994) (explaining this requirement is grounded in the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment).

At a minimum, "*Remmer* requires further inquiry if an 'extraneous communication to [a] juror [is] of a character that creates a reasonable suspicion that further inquiry is necessary to determine whether the defendant was deprived of his right to an impartial jury.'" *Hall*, 692 F.3d at 802 (alterations in original) (quoting *Wisehart v. Davis*, 408 F.3d 321, 326 (7th Cir. 2005)). "How much inquiry is necessary (perhaps very little, or even none) depends on how likely was the extraneous communication to contaminate the jury's deliberations." *Wisehart*, 408 F.3d at 326 (holding a defendant was entitled to a hearing, "however abbreviated" to determine the impact of the *ex parte* communication with the jury). Generally, a court should

"determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Remmer*, 347 U.S. at 229–30, 74 S. Ct. at 451.

Here, the Illinois Appellate Court dispatched Santos' claim in brief fashion, concluding there was no error because it "was well within the judge's discretion" to provide the jury with a dictionary without inquiring as to what words the jury sought to define. (Direct Appeal Order at 19.) The court cited two state court decisions, neither of which addressed any federal or constitutional issues. *See People v. Zeiger*, 100 Ill. App. 3d 515, 519, 426 N.E. 2d 1229, 1233 (3d Dist. 1981) (finding "[f]urnishing a dictionary is a matter within the discretion of the trial court and should be available as part of the common knowledge of jurors, at least in the absence of any indication of prejudice to defendant"); *People v. Petty*, 160 Ill. App. 3d 207, 213, 513 N.E. 2d 486, 489–490 (3d Dist. 1987) (citing *Zeiger* and finding no error in the court's decision to deny the jury's request for a dictionary without inquiring as to what words the jury sought to define). While framing its judgment in terms of state law, the Illinois Appellate Court's affirmance necessarily rejected the constitutional claims Santos raised, including his argument that the *ex parte* communication with the jury and the judge's decision to deliver a dictionary to the jury violated his Sixth and Fourteenth Amendment rights to due process and to be present at all critical stages of his trial. (*See* Direct Appeal Br., State Ct. R., Ex. D (Dkt. No. 18–3) at 37–42.)

We agree with Santos that the communication between the judge and jury, after deliberations had commenced, occurred during a critical stage of trial. *Gagnon*, 470 U.S. at 526, 105 S. Ct. at 1484. Further, it is uncontroverted that neither Santos nor his counsel were present in court when the judge responded to the jury's note and sent a dictionary to the jury. The

decision was made off the record and without the defendant's knowledge or ability to object. This intrusion had the potential to influence the jury's deliberations and render the trial unfair. *Stincer*, 482 U.S. at 745, 107 S. Ct. at 2667 (holding a defendant has a right to be present at any stage of trial that is "critical to its outcome" and if "his presence would contribute to the fairness of the procedure").

Santos raised these constitutional arguments before the state courts, but the state appellate court did not acknowledge, much less address Santos' constitutional right to be present during this critical stage at trial. The court ignored well-established constitutional standards in reaching the cursory conclusion that it was within the trial court's discretion to provide the jury with a dictionary without consulting the defendant or his attorney. More importantly, the state courts failed to make any inquiry into to whether the *ex parte* contact with the jury resulted in prejudice to Santos. For instance, the state courts never addressed the reason prompting the jury's request for the dictionary. Therefore, we cannot know whether and to what extent the dictionary may have influenced the jury's deliberations, and ultimately, their verdict. *See, e.g.*, *Moore*, 368 F.3d at 943 (granting a habeas petition where the state court's "factual findings never actually addressed what the jury was told during the *ex parte* communications—this half of the inquiry is a necessary component of any determination of prejudice"). Suppose, for example, the jury used the dictionary craft an understanding of "reasonable doubt," a term courts have routinely found it is error to define. *See, e.g.*, *United States v. Blackburn*, 992 F.2d 666, 668 (7th Cir. 1993) ("We have reiterated time and again our admonition that district courts should not attempt to define reasonable doubt."); *People v. Evans*, 199 Ill. App. 3d 330, 339, 556 N.E.2d 904, 909 (4th Dist. 1990) ("Neither the court nor counsel should attempt to define the reasonable doubt standard for the jury."). Likewise, if the jury requested the dictionary in order to define a key

term used in the jury instructions, Santos could have objected or requested alternate relief, including that a supplemental instruction be given instead. *See, e.g.*, *United States v. He*, 245 0F.3d 954, 958–59 (7th Cir. 2001) (explaining that "when a jury has asked for a definition of a key term after deliberations have begun," a court may "fail[] to treat [the] issue fairly or adequately" if it does not issue a supplemental instruction). The definitions and meaning ascribed to words used in jury instructions are of crucial importance to the jury's ultimate determination, and to the extent that a dictionary definition was substituted, it may inaccurately reflect the applicable law set forth in the instructions. Because Santos was excluded from the conversation and not permitted an opportunity to know about, much less suggest a response to the jury's question, these issues were left unexplored.

While trial judges have "broad discretion to respond to questions propounded from the jury during deliberations," this discretion does not outweigh the defendant's right to be present during all critical stages of trial and to have the judge's decisions affecting the defendant's substantial rights decided in open court and on the record. *United States v. Young*, 316 F.3d 649, 661 (7th Cir. 2002) (citing *United States v. Watts*, 29 F.3d 287, 291 (7th Cir. 1994)). Thus, although the trial court may have been afforded substantial discretion, the problem here is the court communicated on its own with the deliberating jury and provided them with an outside source of information without Santos or his attorney present. Moreover, neither the trial court nor the appellate court performed any investigation whatsoever as to whether the communication prejudiced Santos. The Illinois Appellate Court's decision affirming the conviction was accordingly objectively unreasonable and "so lacking in justification that

there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103, 131 S. Ct. at 786–87.[1]

## B. Jury Consideration of Extraneous Information

Santos also contends that if provided the opportunity, he would have objected to the jury's use of the dictionary, because it is an outside source of information that may have tainted the jury's deliberations. "The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner v. Louisiana*, 379 U.S. 466, 472, 85 S. Ct. 546, 549 (1965) (quoting *Sinclair v. United States*, 279 U.S. 749, 765, 49 S. Ct. 471, 476 (1929)). "In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Id.* at 472–73 (internal quotation marks omitted); *see also Parker v. Gladden*, 385 U.S. 363, 364–65, 87 S. Ct. 468, 470–71 (1966) (holding a criminal defendant has the right to be tried by twelve

---

[1] Respondent argues that Santos' claim must be denied because "the Supreme Court has never held that a trial judge must consult the defense before providing a jury with a dictionary." (Resp't Br. at 6–7.) We think this too narrow a reading of § 2254(d)'s mandate. *See, e.g.*, *Panetti v. Quarterman,* 551 U.S. 930, 953, 127 S. Ct. 2842, 2858 (2007) ("That the standard is stated in general terms does not mean the application was reasonable. AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.'") (quoting *Carey v. Musladin*, 549 U.S. 70, 81, 127 S. Ct. 649, 656 (2006) (Kennedy, J., concurring)); *see also, e.g.*, *Lockyer v. Andrade,* 538 U.S. 63, 76, 123 S. Ct. 1166, 1175 (2003) ("Section 2254(d)(1) permits a federal court to grant habeas relief based on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced."); *Williams,* 529 U.S. at 382, 120 S. Ct. 1495 (Stevens, J., concurring) ("[R]ules of law may be sufficiently clear for habeas purposes even when they are expressed in terms of a generalized standard rather than as a bright-line rule.").

"impartial and unprejudiced jurors" without "outside influence"); *Remmer*, 347 U.S. at 229,

74 S. Ct. at 451 ("The integrity of jury proceedings must not be jeopardized by unauthorized

invasions."); *Oswald v. Bertrand*, 374 F.3d 475, 477 (7th Cir. 2004) ("The due process clause of

the Fourteenth Amendment entitles a state criminal defendant to an impartial jury, which is to

say a jury that determines guilt on the basis of the judge's instructions and the evidence

introduced at trial, as distinct from preconceptions or other extraneous sources of decision."

(internal citations omitted)).

      A new trial is not required every time there is in an external influence on a jury.

*Smith v. Phillips*, 455 U.S. 209, 217, 102 S. Ct. 940, 946 (1982) ("[D]ue process does not require

a new trial every time a juror has been placed in a potentially compromising situation."); *see also*

*Hall*, 692 F.3d at 805 (holding a defendant must establish he was actually prejudiced by the state

court's constitutional error).  However, "[d]ue process means a jury capable and willing to

decide the case solely on the evidence before it, and a trial judge ever watchful to prevent

prejudicial occurrences and to determine the effect of such occurrences. . . .  Such determinations

may properly be made at a hearing like that ordered in *Remmer*."  *Phillips*, 455 U.S. at 217,

102 S. Ct. at 940; *see also Oswald*, 374 F.3d at 477–78 ("In addition—and this is critical—due

process requires the trial judge, if he becomes aware of a possible source of bias, to 'determine

the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial.'"

(quoting *Remmer*, 347 U.S. at 230, 74 S. Ct. at 451)).  The "ultimate inquiry" as to prejudice is

whether "the intrusion affect[ed] the jury's deliberations and thereby its verdict."

*United States v. Olano*, 507 U.S. 725, 739, 113 S. Ct. 1770, 1780 (1993).  The level of inquiry

required must be commensurate with the level of doubts raised about the jury's impartiality.

*Oswald*, 374 F.3d at 480–83 (holding the state appellate court's "perfunctory" discussion and

"condonation of the lack of a minimally timely, minimally adequate, investigation [into jury bias] was an unreasonable application of *Remmer v. United States* and *Smith v. Phillips*" because the court failed to address the issue of jury prejudice and "said *nothing* beyond the naked conclusion that the judge had done enough").

There is no question Santos' jury was exposed to extraneous information during their deliberations. As with the *ex parte* nature of the judge's decision to provide the jury with the dictionary, the state courts unreasonably and improperly failed to consider whether the jury's use of the dictionary comported with Santos' clearly established constitutional rights. Moreover, the courts failed to conduct any inquiry whatsoever into whether the *ex parte* communications or the extraneous information caused prejudice to Santos—as discussed above, there is no record of the proceedings during which Santos' attorneys learned about the dictionary on the evening of September 26, 2002, and it appears no review, much less a hearing as contemplated by *Remmer*, took place after his attorney learned about the dictionary and objected. (*See, e.g.*, Aff. in Support of Mot. for New Tr., State Ct. R., Ex. EE (Dkt. No. 18–31) at C 238–39.) Likewise, when Santos asked for a new trial, based in part on the *ex parte* decision to provide the jury the dictionary, the trial court confirmed that it conducted no inquiry into why the jury requested the dictionary or what they used it for. (Trial Tr., State Ct. R., Ex. BB (Dkt. No. 18–28) at TTT 21–22) ("I can tell you how [the] Webster's Dictionary was sent back to the jury. It was a note requesting a dictionary. Neither party was present, and I directed a Webster's Dictionary be forwarded to the jury. I did not inquire what word was in question or if they wanted Black's Dictionary. That was not the tenure of the note itself. . . . The motion is respectfully denied.").) The state appellate court also condoned the lack of a hearing, concluding that the trial court acted "well within its discretion" in giving the jury the dictionary. (Direct Appeal Order at 19.)

As Santos observes, and for the reasons discussed above, it is reasonable under these circumstances to infer that the jury requested and used the dictionary to define legal terms that influenced the jury's determination of guilt. *See, e.g., Moore*, 368 F.3d at 943 (failing to inquire about the content of third-party communications with the jury was error as such an inquiry is a "necessary component of any determination of prejudice"). The court's decision was an unreasonable application of clearly established federal law, which requires some inquiry as to whether an outside intrusion on the jury's deliberations caused prejudice—particularly here, where the dictionary potentially contaminated the jury's deliberations. *See, e.g., Parker*, 385 U.S. at 364–65, 78 S. Ct. at 470–71 (finding that a bailiff's statement to jurors that the defendant was a "wicked fellow" and "guilty" constituted an "outside influence" that violated the defendant's Sixth Amendment right to confrontation and a fair trial (internal quotations omitted)); *Turner*, 379 U.S. at 473–74, 85 S. Ct. at 550 (finding a violation of defendant's Sixth Amendment rights where two deputies were assigned to guard the jury and also were witnesses called to testify at trial); *Remmer*, 347 U.S. at 229, 74 S. Ct. at 451 (finding an alleged bribe to a juror in exchange for a favorable verdict was presumptively prejudicial tampering with the jury, requiring a hearing in which all parties may participate); *Oswald*, 374 F.3d at 483 (finding the state appellate court's discussion of the potential jury bias issue was "perfunctory" where it "said nothing beyond the naked conclusion that the judge had done enough" and where the inquiry into bias was "too truncated" to be constitutionally sound). Thus, Santos was entitled to a hearing, "however abbreviated," to determine whether he was prejudiced by the jury's use of the dictionary, but the state court failed to apply *Remmer* or any reasonable version of it. *Wisehart*, 408 F.3d at 326; *accord. Hall*, 692 F.3d at 805. The Illinois Appellate Court's opinion affirming Santos' conviction unreasonably applied clearly established Supreme Court law such that no

"fairminded jurists" would agree with its reasoning or its conclusion. *See Richter*,

131 S. Ct. at 786–87.

C.    **Prejudice**

Next, we must determine whether the violation of Santos' constitutional rights caused

prejudice and affected the jury's verdict. *Rushen*, 464 U.S. at 120, 104 S. Ct. at 456 (holding an

*ex parte* communication conducted off the record was a harmless error, but explaining "[t]his is

not to say that *ex parte* communications between judge and juror are never of serious concern or

that a federal court on habeas may never overturn a conviction for prejudice resulting from such

communications"); *Hall*, 692 F.3d at 805 ("The *Remmer* presumption is meant to protect against

the potential Sixth Amendment harms of extraneous information reaching the jury, but a state

court's failure to apply the presumption only results in actual prejudice if the jury's verdict was

tainted by such information."). "For reasons of finality, comity, and federalism, habeas

petitioners 'are not entitled to habeas relief based on trial error unless they can establish that it

resulted in 'actual prejudice.'" *Davis v. Ayala*, 135 S. Ct. 2187, 2197, *reh'g denied,*

136 S. Ct. 14 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637,

113 S. Ct. 1710, 1722 (1993)); *accord. O'Neal v. McAninch*, 513 U.S. 432, 439,

115 S. Ct. 992, 996 (1995); *Hall*, 692 F.3d at 805; *Jones v. Basinger*, 635 F.3d 1030, 1052

(7th Cir. 2011). Habeas relief must be granted if "grave doubt" exists as to whether the trial

error had a "substantial and injurious effect or influence in determining the jury's verdict."

*O'Neal*, 513 U.S. at 436, 115 S. Ct. at 994; *Jones*, 635 F.3d at 1052. "[W]hen a federal court is

in equipoise as to whether an error was actually prejudicial, it must 'treat the error, not as if it

were harmless, but as if it affected the verdict.'" *Davis*, 135 S. Ct. at 2211 (quoting

*O'Neal*, 513 U.S. at 435, 115 S. Ct. at 992).

Where a state court error resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law, we resolve the prejudice issue "unencumbered by the deference AEDPA normally requires." *Panetti*, 551 U.S. at 948, 127 S. Ct. at 2855; *see also Rompilla v. Beard*, 545 U.S. 374, 390, 125 S. Ct. 2456, 2467 (2005) (reviewing the prejudice requirement for an ineffective assistance of counsel claim de novo after identifying a § 2254(d)(1) error in the state court's evaluation of the performance requirement); *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S. Ct. 2527, 2542 (2003) (reviewing the prejudice prong of an ineffective assistance of counsel claim "not circumscribed by a state court conclusion" where the state courts failed to reach the issue). The Illinois Appellate Court failed to consider the prejudicial impact of the outside influences on the jury's deliberations, and we therefore evaluate prejudice without deference to the state court. *Panetti*, 551 U.S. at 948, 127 S. Ct. at 2855. Because the state courts abdicated their duty to hold a hearing or investigate why and how the jury used the dictionary, we cannot make a prejudice determination based on the record before us. *See, e.g.*, *Hall*, 692 F.3d at 806. There is no record reflecting the content of the trial judge's *ex parte* communication with the jury or the circumstances under which the trial judge provided the jury with the dictionary, and we have no facts before us indicating the reason the jury asked for the dictionary or what they ultimately used it for. (*See, e.g.*, Aff. in Support of Mot. for New Tr., State Ct. R., Ex. EE (Dkt. No. 18–31) at C 238–39; Trial Tr., State Ct. R., Ex. BB (Dkt. No. 18–28) at TTT 21–22.)

Accordingly, an evidentiary hearing must be held to determine whether the jury's communication with the judge and its use of the dictionary had a prejudicial impact on the verdict. *Hall*, 692 F.3d at 805–06; *Jordan v. Hepp*, 831 F.3d 837, 848–50 (7th Cir. 2016). We deem the *ex parte* communication and the introduction of the dictionary into the jury's

deliberations presumptively prejudicial, and the government will bear the heavy burden of establishing these outside influences on the jury were harmless. *Remmer*, 347 U.S. at 229, 74 S. Ct. at 451; *Hall*, 692 F.3d at 807. Although our inquiry is circumscribed by Federal Rule of Evidence 606(b)(1), which prohibits certain juror testimony regarding what occurred in a jury room, Rule 606(b)(2)(B) creates an exception permitting jurors to testify about whether "an outside influence was improperly brought to bear on any juror."

*See Warger v. Shauers*, ⸺ U.S. ⸺, 135 S. Ct. 521, 524 (2014). To the extent jurors are questioned about their deliberations, the questions asked must be limited to the content of the outside information and whether it reached the jury. *Hall*, 692 F.3d at 806. We may also "determine—without asking the jurors anything further and emphatically without asking them what role the communication played in their thoughts or discussion—whether there is a reasonable possibility that the [outside information] altered their verdict." *Id.* (quoting *Haugh v. Jones & Laughlin Steel Corp.*, 949 F.2d 914, 917 (7th Cir. 1991)). Along with inquiry into the nature of the outside influence on the jury, we may also consider, among other things, the power of any curative instructions at trial and the strength of the legitimate evidence presented by the State. *Id.* at 807. With these guiding principles in mind, we conclude Santos is entitled to an evidentiary hearing to determine whether and to what extent the *ex parte* communication and outside influence of the dictionary contaminated the jury's deliberations.

## II.  CLAIM TWO: *BRADY* VIOLATION

Santos also claims the State violated *Brady v. Maryland* in failing to disclose an alleged audiotape of Detectives Trahanas' interview with his mother, Aidali Oquendo, which he argues impeaches Detective Trahanas' suppression hearing testimony, and is therefore material. Detective Trahanas testified during the suppression hearing that he did not threaten Santos or tell

him that the police would arrest his family if he failed to cooperate with them.  *Santos*, 2014 IL App (1st) at ¶¶ 12, 20.  Santos argues that had he known about the audiotape—which he alleges shows detectives threatened Oquendo and told her that if she did not answer their questions, she would be charged with a crime—he could have impeached Detective Trahanas at the suppression hearing when the detective denied that he ever threatened Santos.

Pursuant to *Brady*, the prosecution has an affirmative duty to disclose to a criminal defendant "any evidence favorable to an accused which is material either to guilt or to punishment."  373 U.S. at 87–88, 83 S. Ct. at 1197; *accord. Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001).  "The suppression of such evidence deprives the defendant of a fair trial and thus violates due process."  *Boss*, 263 F.3d at 740 (citing *Brady*, 373 U.S. at 86–87, 83 S. Ct. at 1196).  To establish a *Brady* violation, a petitioner must first prove that the prosecution "failed to give him evidence favorable to his defense, that would tend to show his innocence, or that could be used to impeach witnesses at trial."  *Morgan*, 662 F.3d at 800 (citing *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196–97)).  Second, a petitioner must show that the evidence was material, meaning "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985).  "The reasonable probability standard for materiality of suppressed evidence is less rigorous than a preponderance of the evidence standard in that a petitioner need only show that the new evidence undermines confidence in the verdict."  *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010) (citing *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555 (1995)); *accord. Strickler v. Greene*, 527 U.S. 263, 290, 119 S. Ct. 1936, 1952 (1999) ("[T]he question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in

the verdict" (internal quotations omitted)). Only admissible evidence can be material. *Jardine v. Dittman*, 658 F.3d 772, 777 (7th Cir. 2011).

In Santos' postconviction proceedings, the Illinois Appellate Court applied *Brady* and concluded the allegedly withheld evidence was not material. *Santos*, 2014 IL App (1st) at ¶ 22. The state court reasoned that Detective Trahanas' testimony at the suppression hearing was not "materially inconsistent" with the alleged threats to Oquendo, and therefore, would not be admissible impeachment evidence under Illinois law. *Id.* (citing *Schiff v. Friberg*, 331 Ill. App. 3d 643, 656, 771 N.E.2d 517, 529 (1st Dist. 2002)). Generally, "inadmissible evidence is immaterial," and federal courts in habeas proceedings "defer to state-court descriptions of state law even if they do not agree with those descriptions," unless state rules must yield to federal rights. *Jardine*, 658 F.3d at 777 (citing *Estelle*, 502 U.S. at 67–68, 112 S. Ct. at 480; *Sussman v. Jenkins*, 636 F.3d 329, 352 (7th Cir. 2011); *George v. Smith*, 586 F.3d 479, 484 (7th Cir. 2009), *cert denied*, 130 S. Ct. 3414 (2010)).

The Illinois Appellate Court correctly articulated the law with respect to the disclosure of *Brady* evidence and concluded that the alleged favorable evidence was inadmissible under state law as it would not affect Detective Trahanas' credibility, and we defer to the state court's reasonable determination. *Jardine*, 658 F.3d at 777. Moreover, "[i]t is an unsettled question whether *Brady* applies to pretrial suppression hearings," and therefore, we cannot determine that the state court's decision was contrary to or an unreasonable determination of clearly established federal law. *United States v. Thomas*, 835 F.3d 730, 734 (7th Cir. 2016). In any case, even if the tape was admissible, Santos has failed to show that introducing the tape would have cast "the whole case in such a different light as to undermine confidence in the verdict." *Greene*, 527 U.S. at 290, 119 S. Ct. at 1952. Santos argues that evidence of Detective Trahanas'

interrogation of his mother corroborates his allegation that Detective Trehanas improperly interrogated Santos, but this argument fails for several reasons. First, the state court found that the alleged taped interview with Oquendo took place two days after Santos had already made his inculpatory statement to detectives. Further, it is not clear that Detective Trahanas used improper techniques or that his statements to Oquendo after Santos' interrogation had any bearing on the admissibility of Santos' confession. Finally, even if Santos' videotaped confession was excluded, he has not shown it would undermine confidence in the verdict, particularly in light of his other statements to police at the time of his arrest and the weight of the other evidence against him. Accordingly, for the foregoing reasons, we deny Santos' petition as to Claim Two.

## CONCLUSION

For the reasons set forth above, we determine Santos is entitled to an evidentiary hearing on Claim One of his petition in order to determine whether he was prejudiced by the state court's *ex parte* communication with the jury and the jury's consideration of a dictionary during their deliberations. Under Rule 8(c) of the Rules Governing § 2254 Cases, we hereby appoint counsel to aid Santos in the evidentiary hearing to be conducted before Magistrate Judge Sheila Finnegan. The Magistrate Judge after conducting the hearing shall file a Report and Recommendation as to Claim One. Santos' petition is denied with respect to the *Brady* claim raised in Claim Two. A status hearing is set before this Court on March 2, 2016. It is so ordered.

_____
Marvin E. Aspen
United States District Judge

Dated: December 2, 2016
      Chicago, Illinois