**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CARLOS SANTOS, R59811,** | ) | |
| | ) | |
| **Petitioner,** | ) | **No. 15 C 5325** |
| | ) | |
| **v.** | ) | **Judge Marvin E. Aspen** |
| | ) | |
| **RANDY PFISTER,** | ) | **Magistrate Judge Finnegan** |
| | ) | |
| **Respondent.** | ) | |

**REPORT AND RECOMMENDATION**

Petitioner Carlos Santos ("Santos") filed a petition for a writ of habeas corpus under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, challenging his 2006 conviction for first degree felony murder. (Doc. 1). He asserted (among other claims) that the state violated his Fifth, Sixth, and Fourteenth Amendment rights when the trial judge: (1) communicated *ex parte* with the deliberating jury in response to a request for a dictionary; (2) provided the jury with a dictionary without informing Santos or his counsel; and (3) failed to determine what words or legal terms the jury sought to define. (*Id.* at 2, 5, 11-13).

Judge Aspen has already ruled that the trial judge's *ex parte* communication with the jury about a dictionary, and the jury's consideration of extraneous material from the dictionary, violated clearly established federal law where neither the trial or appellate court inquired whether "an outside intrusion on the jury's deliberations caused prejudice" as required by *Remmer v. United States*, 347 U.S. 227 (1954), and other precedent. (Doc. 34, at 17-18). *Santos v. Williams*, No. 15 C 5325, 2016 WL 7077104, at *7-8 (N.D. Ill. Dec. 2, 2016) ("*Santos I*"). Judge Aspen also determined, however, that Santos was entitled to habeas relief only if he demonstrated actual prejudice in that "the constitutional

error 'had substantial and injurious effect or influence in determining the jury's verdict.'" (Doc. 59, at 15). *Santos v. Williams*, No. 15 C 5325, 2017 WL 2189102, at *8 (May 18, 2017) ("*Santos II*") (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *Hall v. Zenk*, 692 F.3d 793, 798 (7th Cir. 2012)). Lacking information from which to assess actual prejudice, Judge Aspen referred the case to this Court to conduct an evidentiary hearing and then provide a Report and Recommendation. *Santos I*, 2016 WL 7077104, at *10.[1]

Notwithstanding the passage of time, 11 of the 12 jurors from the Santos trial were eventually located (one juror was deceased), and each juror provided testimony either in person or by video conference. (Docs. 97, 107, 111, 122, 126, 136; Doc. 122, at 25). Having now considered the entire record and the parties' post-hearing briefs (Docs. 145, 154, 162), this Court recommends that Santos' petition for a writ of habeas corpus be denied.

## <u>OVERVIEW</u>

Before summarizing in detail the testimony of the jurors and other background facts, it is helpful to have an overview of the underlying criminal case and the parties' arguments before this Court.

Santos and two others (all armed with guns) went to collect a drug debt at the house of a person who had been fronted a kilo of heroin to sell. That person (James Smith) was not home, but after a brief exchange with others in the house, his son came

---

[1] After issuing *Santos I*, Judge Aspen issued *Santos II*, granting in part Respondent's motion to reconsider by clarifying that Santos bore the burden of proving actual prejudice to prevail on his habeas claim. *Santos II*, 2017 WL 2189102. In a third opinion ("*Santos III*"), Judge Aspen denied Santos' motion to reconsider, rejecting his argument that a presumption of prejudice exists and so he is entitled to habeas relief unless Respondent proves the harmlessness of the errors. (Doc. 76, at 4-5).

to the door bearing a large gun. A shootout followed, during which the son was fatally struck by a bullet, though not from the gun that Santos fired. At Santos' trial, the State proceeded only on counts of felony murder predicated on attempt aggravated kidnapping, attempt residential burglary, and attempt aggravated unlawful restraint. To find Santos guilty, the jury had to find that Santos, or one for whose conduct he was legally responsible, combined to commit one of those three underlying felonies, and that the decedent was killed by one of the men while attempting to commit that unlawful act.

During the trial, the State offered into evidence statements of Santos from various post-arrest interviews. In a final videotaped statement (and in some but not all of the earlier unrecorded statements), Santos said he and the other men had discussed what they would do if James Smith ("Smith") refused to pay the drug debt; they would take him by force and hold him until his family and friends delivered the money or the drugs. If he was not home, they would go inside and look for the money or drugs. When Santos testified at trial, however, he denied any such plan. Instead, Santos said he and the others planned only to collect the drug debt, and he had told this to the interviewing police officers and the Assistant State's Attorney ("ASA") following his arrest. Santos claimed he eventually (and falsely) said there was a plan to commit the underlying felonies, but only because of promises and threats made by the police officers.

After the jury deliberated for about one and a half hours, the judge informed the parties that the jury had requested a dictionary and a new set of verdict forms, both of which the judge had already provided. The jury deliberated for another hour and a half that day. At Santos' request, the dictionary was removed from the jury room before the second day when the jury deliberated for another hour and 15 minutes before returning a

guilty verdict. No inquiry was ever made of the reason for the jury requesting a dictionary or how the jury had used it.

During this Court's evidentiary hearings, only two jurors remembered the dictionary. One juror "seem[ed] to recall" jurors looking up words in a dictionary, but was unable to provide further information. (Doc. 107, at 16). A second juror remembered that he and perhaps one or two others looked up a single word for a few minutes. While he initially could not recall the word, the juror later said he thought the word had something to do with collaboration, conspiracy, or collusion, though he might be wrong. (Doc. 122, at 9-12,17-20). A third juror did not remember the jury requesting or receiving a dictionary, but when specifically asked if the jury ever requested clarification "on the term collusion[,]" responded "[m]aybe." (Doc. 136, at 8, 15-17).

In opposing the habeas petition, Respondent argues that "the dictionary likely had no effect on the jury's verdict" since most jurors had no recollection of the dictionary and those who did lacked a "reliable" memory. (Doc. 154, at 2-3). Respondent also asserts that any claim of prejudice is "speculative at best" since at most two or three jurors looked up a single word in the dictionary for only a few minutes, and that word was not in the jury instructions. (*Id.* at 4-5). Santos, on the other hand, contends that "three jurors obtained information about three potential words, all of which affect the legal focus of the crimes charged." (Doc. 145, at 23). He also asserts there is "more than a reasonable possibility that the extraneous information altered the verdict" based on the importance of the words, the difference between the dictionary definitions of those words and the jury instructions, the jury's alleged "struggle" to reach a verdict, and the lack of overwhelming evidence of

guilt.  (*Id.*).  Santos finally argues the "burden is now on the state to prove countervailing facts to alleviate the prejudice[,]" and there are none.  (*Id.*).

## BACKGROUND

**I.    2006 Trial**

    **A.    Evidence**[2]

Santos' conviction stemmed from a May 3, 2002 attempt to collect a drug debt that resulted in a shootout and the death of Jeffrey Smith ("decedent") from gunshot wounds. (Doc. 18-1, at 2; Doc. 18-2, at 2 ¶¶ 4-5).  Following his arrest on May 14, 2002 at 10:30 p.m., Santos was interviewed by Detective Trahanas and Sergeant Wojcik.  (*See* Doc. 18-1, at 4; Doc. 18-2, at 2 ¶ 6 – 3 ¶ 8; Trial Tr. (Doc. 18-29), at 61).  Santos initially denied any knowledge of or involvement in the shooting, but then described what had happened, including the following:

- Santos and his brother-in-law Alexander Valencia ("Valencia") sold narcotics and had given Smith—the decedent's father—a kilo of heroin (worth $70,000 to $80,000) on consignment, but Smith never paid for the kilo.

- Santos and Valencia contacted Smith several times in an attempt to get their money.  Smith eventually turned off his phone.  Valencia went to Smith's house several times and finally located him.  Smith indicated that he did not have the money and would kill Valencia if he came around again.

- Santos and Valencia then sought the help of Valencia's friend, "Richardson," from the Cook County Sheriff's Office to collect the money, paying him $5,000 to help. Santos, Valencia, and Richardson drove to Smith's house where Richardson talked to Smith and arranged for him to pay the money the following Monday.  But Smith did not pay.

---

[2]    For ease of reference and consistency when citing the state court record (Doc. 18) and the briefs (Docs. 145, 154, 162), this Report and Recommendation uses the document and page numbers stamped at the top of each page by the Northern District of Illinois electronic case filing system.  The summary of the trial evidence that follows borrows heavily from state court opinions describing testimony from the nine trial witnesses (two by stipulated testimony), as well as the videotaped statement of Santos.  (Direct App. Order (Doc. 18-1), *People v. Santos*, No. 1-07-2007, at 2-8 (Ill. App. Ct. July 14, 2009); Post-Conviction App. Order (Doc. 18-2), *People v. Santos*, No. 1-12-3129, at 2 ¶ 4 – 5 ¶ 14 (Ill. App. Ct. Dec. 23, 2014)).

- Santos and Valencia decided to return to Smith's house. Richardson was not available, but told them to meet with his friend, John Lavelle ("Lavelle"), who was also a Cook County Sheriff. After meeting with Lavelle, they decided to recruit the help of another Cook County Sheriff, Esteban Perkins ("Perkins"), whom Lavelle knew. Santos and Valencia agreed to pay Lavelle $5,000 for his help.

- On May 3, 2002, Santos, Valencia, Lavelle, and Perkins drove to Smith's house. The Sheriffs (Lavelle and Perkins) were dressed like "narcs" in their vests and badges. Lavelle carried two guns, and Perkins had one gun in the holster. Santos, Lavelle, and Perkins walked onto the porch of Smith's house, and Santos knocked on the window. A voice from inside asked what they wanted, and Santos asked for Smith.

- The decedent then answered the door holding a big gun. Perkins turned and ran, while Santos and Lavelle backed down the stairs. The decedent began shooting. Santos pulled out his .380 automatic and tried to shoot the decedent, but the gun did not work until he pulled the slide and it went off. Lavelle, who had taken cover behind a car, fired two shots at the decedent. Santos then heard the decedent scream and knew he had been shot. They all fled the scene.

(Doc. 18-1, at 2-5; Doc. 18-2, at 2 ¶¶ 4-5; Video Interview Tr. (Doc. 18-17), at 3-4).

Detective Trahanas testified that in the initial interview at the police station following his arrest, Santos said only that he and the other men had gone to the Smith house to collect a drug debt; he did not say anything about a plan to break into the house, or to kidnap Smith or take someone else from the house, if necessary to collect the debt. (*See* Doc. 18-29, at 89-93, 123-124). In a later interview, at about 2:45 a.m. on May 15, 2002, Detective Trahanas and Sergeant Wojcik asked Santos to go through the chronology from the beginning. (*Id.* at 93-94). It was at this time that Santos reportedly described a meeting with Lavelle where they "decided that one way or another" they would get the money or the drugs and would kidnap someone for ransom. (*Id.* at 102-04).

ASA Buntinas testified that, at about 9:30 a.m. on May 15, 2002, he met with Santos in the presence of Detective Trahanas and Sergeant Wojcik for 45 minutes to an hour and heard Santos give an oral statement. (Trial Tr. (Doc. 18-23), at 44-46, 119-20).

6

After this, ASA Buntinas continued with the investigation and spoke with others who were in custody. (*Id.* at 120). Later in the day, at about 6:30 p.m., ASA Buntinas met with Santos again, asked if Santos wanted to memorialize the statement he had given earlier, and described the methods for doing so. (*Id.* at 50-51). Santos opted for a videotaped statement. (*Id.* at 51). At that point, and after the police officers had left the interview room, ASA Buntinas asked Santos how he had been treated and whether any promises had been made to ensure that the statement was given "freely and voluntarily." (*Id.* at 51-52). Santos said no one had promised him anything and the police had treated him well. (*Id.* at 52).

### 1.    Videotaped Statement

It was not until about 10:30 p.m. on May 15, 2002, after signing a consent, that Santos gave a lengthy videotaped statement (the transcript is 35 pages). (Doc. 18-17). He again described the events surrounding the May 3, 2002 shooting. (*See id.*). According to ASA Buntinas, the statements made during the videotaped interview consisted of everything Santos had previously told him earlier that day. (Doc. 18-23, at 119). Among other things, Santos admitted that he and the others had discussed what would happen when they went to Smith's house. (Doc. 18-17, at 20). If Smith was home but did not have the money or the drugs, they were going to take him by force and hold him until the family or associates showed up with what was owed. (*Id.* at 2-3, 20). And if Smith was not home, they were going to forcibly go into the house and look for the money or drugs. (*Id.* at 2-3, 20-21).[3] As before, Santos said no threats or promises had been

---

[3]      Santos responded to ASA Buntinas' questions as follows:

> Q. Okay. At that point did you guys talk about going to get the money?
> A. Yes.

7

made to him in exchange for the statements. (*Id.* at 34). The videotaped statement was played for the jury at trial. (Doc. 18-23, at 57-59, 63).

### 2. Santos' Trial Testimony

When Santos testified in the defense case, he admitted many of the facts in the videotaped statement, specifically that: (1) there was an agreement to pay Lavelle and Perkins out of the money to be collected from Smith; (2) the four men drove to Smith's house and parked nearby; (3) Santos, Lavelle, and Perkins were all armed when they approached the house; (4) a shootout occurred after the decedent came to the door armed with a big gun "like a machine gun or an uzi" and fired at them; (5) Santos fired his own gun during the shootout while struggling to load it; and (6) Lavelle said he thought he had shot the decedent as they fled after the shootout. (Trial Tr. (Doc. 18-24), at 47-48, 54, 69-70, 120-42).

---

Q. Okay. What was the plan with regard to, to going to get going to get the money?

A. Well, it was, we were supposed to go knock and see if James was there. If James was there we were gonna take him. And then we were gonna make him call his, his friend or his family for him to give us the money or the drugs.

Q. Okay. And what was gonna happen - - did you guys talk about what was gonna happen if John -- if James didn't want to go with?

A. They were gonna take him by force.

Q. Okay. And did they talk about whether or not they were gonna bring guns or anything?

A. Yeah, cause they had they were dressed up like a detective.

Q. Okay. Did, did they talk about - - did you guys talk about in terms of what would happen if, if James weren't at home?

A. Yes.

Q. And what was the plan?

A. That he was -- they were gonna go inside and they were gonna look for the money or the drugs.

(Doc. 18-17, at 20-21).

Santos also acknowledged during his trial testimony that he knew there were consequences for not paying for drugs in a timely fashion, and he knew the consequences of not paying his Florida supplier could be severe, including violence and possibly death. (*Id.* at 94-95). Santos further testified (and indicated in the videotaped statement) that after they all fled from the shooting scene, Lavelle was mad about not being paid, so Valencia had to stay with Lavelle and Perkins until money was paid to Lavelle and the car was returned to Perkins. (*Id.* at 146-48; *see* Doc. 18-17, at 32-33). Only after Lavelle received a partial payment of $2,000 or $3,000 (obtained from family members of Santos and Valencia) and the car was returned, did Valencia return home. (Doc. 18-24, at 70-72, 146-48; *see* Doc. 18-17 at 32-33).

Santos denied, however, that the four men had any plan to restrain or kidnap Smith or to burglarize his house to collect the drug debt. (Doc. 18-24, at 14-15, 32-33, 41-42). Rather, Santos testified that he "kept telling" the investigating officers (Detective Trahanas and Sergeant Wojcik) that "there was no plan" and the four men simply went to Smith's house "to pick up the money," but the officers "kept insisting there was a plan" and "wouldn't help" Santos unless he admitted as much. (*Id.* at 83-88). Santos said he ultimately gave a false statement admitting the plan to kidnap and hold Smith, and burglarize his house, but only after much rehearsing with the officers and ASA Buntinas and with the promise that he "would only be a witness" against Lavelle and Perkins and would not be prosecuted. (*Id.* at 80-83, 87-90 ("They told me that if I helped them that they were going to, you know, let me go.")). In the State's rebuttal case, Detective Trahanas and ASA Buntinas gave testimony that contradicted what Santos had claimed. (*Id.* at 183-84, 189-90). Detective Trahanas acknowledged (as he had when testifying in

the case-in-chief) that Santos did not tell the officers about a plan to rob and kidnap Smith during their initial interview of him at the police station but only in later interviews. (*Id.* at 185-86).

## B.    Key Jury Instructions

After closing arguments, the jury was instructed that Santos was charged with first degree murder and also with the additional facts that, during the commission of this offense, Santos was armed with a firearm and personally discharged a firearm. (Trial Tr. (Doc. 18-27), at 165, 186).

To find Santos guilty of first degree murder, the jury was instructed that it had to find beyond a reasonable doubt that Santos (or one for whose conduct he was "legally responsible") not only caused the death of the decedent but did so when attempting to commit the offense of residential burglary, aggravated kidnapping, or aggravated unlawful restraint. (*Id.* at 177). While it was not necessary that Santos (or one for whose conduct he was legally responsible) originally intended to kill the decedent, the jury had to find that Santos and one for whose conduct he was legally responsible "combined" to commit residential burglary, aggravated kidnapping, or aggravated unlawful restraint and that the decedent was killed "by one of the parties attempting to commit that unlawful act." (*Id.* at 173). The jury was further informed that "[a] person is legally responsible for the conduct of another person when, either before or during the commission of an offense and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid or attempts to aid the other person in the planning or commission of an offense." (*Id.* at 172). The jury was instructed that an "attempt" occurs when "with the intent to commit the offense of residential burglary, aggravated kidnapping

10

or aggravated unlawful restraint[,]" a person "does any act which constitutes a substantial step toward the commission of" these offenses. (*Id.* at 174). The offenses were separately defined. (*Id.* at 180-83).

The jury was given two verdict forms for the charge of first degree murder, one finding Santos guilty and one finding him not guilty. (*Id.* at 186). In the event the jury found Santos guilty of murder, they were then to consider the "additional facts" of whether he was armed with a firearm and personally discharged it. (*Id.* at 187). The jury was given three verdict forms and was to sign one of them finding that: (1) the additional facts did not exist; (2) Santos was armed with a firearm; or (3) Santos was armed with a firearm and personally discharged it. (*Id.* at 187-88).

### C. Jury Deliberations and Verdict

After deliberating for four and a quarter hours over two days, the jury signed two verdict forms reflecting a unanimous verdict that Santos was guilty of first degree murder and that, during the commission of that offense, Santos was armed with a firearm and personally discharged it. (Doc. 18-27, at 196, 203; Trial Tr. (Doc. 18-28), at 5-8). During the deliberations, certain events occurred that are central to the habeas claim and the parties' arguments, so are discussed in detail.

#### 1. Request for Dictionary

Jury deliberations began at 6:35 p.m. on September 26, 2006. (Doc. 18-27, at 196). About an hour and a half into the deliberations (at approximately 8:00 p.m.), counsel for both sides were summoned to the courthouse and informed upon arrival that the jury had requested a dictionary, and the trial judge had already provided it. (*See* Affidavit of defense counsel ("Affidavit") in Support of Amended Motion for New Trial (Doc. 18-31),

at 239-40 ¶¶ 1-2, 5). There is no transcript of this discussion with counsel. Nor does the record contain any note from the jury about a dictionary or a response. But these undisputed facts are apparent from the Affidavit (*see id.* at 239-40 ¶¶ 1-3, 5-7) as well as from the trial judge's comments during the hearing on that motion. (*See* Doc. 18-28, at 35-38, 43-45). When the motion was argued, the trial judge confirmed that the jury had sent a note requesting the dictionary while counsel were not present, and he had directed that a Webster's dictionary be provided without inquiring what word was in question. (*Id.* at 44-45).[4]

According to the Affidavit, the jury retained possession of the dictionary until approximately 9:35 p.m. on September 26, 2006 when the jurors ceased deliberating and were sequestered for the evening. (Doc. 18-31, at 240 ¶ 6). At the request of Santos' counsel, the jury was not given the dictionary when they returned to the jury room the next day. (*Id.* at 240 ¶ 7).

### 2. Request for New Verdict Forms

When the parties returned to the courtroom at about 8:00 p.m. on the first day of deliberations, the trial judge also disclosed that the jury had requested and been given a new set of verdict forms. (Doc. 18-31, at 239 ¶¶ 2-4, 244 ¶¶ 31-33). Again, there is no transcript of this discussion between the trial judge and counsel, but the pertinent facts are undisputed, and the record includes both the trial judge's note to the jury directing

---

[4]     At that motion hearing, defense counsel said he had submitted the Affidavit in part because no transcript existed of the discussions concerning the dictionary and new verdict forms (discussed below), and he "wanted to make those issues a part of the record" to "properly preserve these issues for appeal[.]" (Doc. 18-28, at 35-38). The prosecutor's handwritten trial notes (Doc. 154, at 11 n.8) similarly reflect that, after the jury went out at 6:35 p.m. on September 26, 2006, "Jury asks for dictionary – Judge gives jury a dictionary w/o consulting parties." (Doc. 154-1, at 3). The prosecutor's notes further reflect that the following morning, "Δ Attys put on record that Ct gave jury a dictionary – Δ Attys do not want a mistrial[.]" (*Id.*) (emphasis in original). But the record does not include such a transcript, and the Affidavit makes no mention of this, so the Court assumes no such on-the-record discussion occurred.

that the spoiled verdict forms be preserved and the actual spoiled forms. (*Id.* at 183-85, 194, 239-40 ¶¶ 2-5 (defense counsel stated that, upon returning to the courthouse around 8:00 p.m., the parties were informed when they returned that both items—the dictionary and new verdict forms—had been provided to the jury); *see also* Doc. 154-1, at 3 (prosecutor's notes state: "8:30 p.m. – Jury has written on one of the verdict forms – New set of verdict forms provided"). The spoiled verdict forms reflect that four jurors had not signed any form while another juror had signed both guilty and not guilty forms on the first degree murder charge. (*See* Doc. 18-31, at 184-85, 194).

### 3. Request for Clarification of Verdict Forms

At 11:00 a.m. on September 27, 2006, the jury resumed deliberations for a second day. (Doc. 18-28, at 5; *see* Doc. 18-31, at 240 ¶ 7). Shortly thereafter, the trial judge informed counsel (on the record) that he had received a note from the jury that read: "Clarification of three forms we need to sign." (Doc. 18-28, at 5). The judge proposed responding to this communication by referring the jury back to the jury instructions as follows: "Please refer to the jury instructions which begins, 'When you retire to the jury room, you first will elect . . . '" (*Id.* at 5-6).[5] Both sides agreed to this proposal. (*Id.*).

### 4. Verdict

At 12:15 p.m. on the second day of deliberations, the jury reached a verdict, finding that Santos was guilty of first degree murder and, during the commission of the offense, had been armed with and personally discharged a firearm. (Doc. 18-28, at 6-8; 18-31 at 181-182).

---

[5] The jury instruction that begins with this sentence describes the charges and the verdict forms and explains how the forms are to be used. (*See* Doc. 18-27, at 186-88; Doc. 18-31, at 134).

## II.    Post-Conviction Proceedings

Santos challenged his conviction in a Motion for New Trial (Doc. 18-31, at 237-38) and an Amended Motion for New Trial (*id.* at 239-44), which were denied.  (Doc. 18-28, at 44-45).  His direct appeal was also unsuccessful (Doc. 18-1), as was his post-conviction petition.  (Doc. 18-2).  Judge Aspen's prior orders thoroughly discussed the issues raised in the state court proceedings and his reasons for finding that Santos did not procedurally default the habeas claim now at issue.  *See Santos I*, 2016 WL 7077104, at *3-8; *Santos II*, 2017 WL 2189102, at *2-6.

## III.    Federal Habeas Petition and Referral for Evidentiary Hearing

In Santos' habeas petition (Doc. 1), he asserts that "the state violated his Fifth, Sixth, and Fourteenth Amendment rights when the trial judge communicated *ex parte* with the deliberating jury, provided them a dictionary, and failed to ascertain what the jury used it for after it was removed[.]"  *Santos II*, 2017 WL 2189102, at *1.[6]  Judge Aspen has already concluded that Santos was entitled to and deprived of a hearing in the state court to determine whether "an outside intrusion on the jury's deliberations caused prejudice" (known as a "*Remmer* hearing") and so referred the matter to this Court to conduct an evidentiary hearing "to determine whether [Santos] was prejudiced by the state court's *ex parte* communication with the jury and the jury's consideration of a dictionary during their deliberations."  *Santos I,* 2016 WL 7077104, at *10; *see Santos II*, 2017 WL 2189102, at *1, 8.  Judge Aspen cautioned, however, that the hearing should be conducted in a manner consistent with Federal Rule of Evidence 606(b):

> To the extent jurors are questioned about their deliberations:

---

[6]    Santos also asserted a second habeas claim—that the State violated his right to due process by failing to disclose material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  Judge Aspen denied this claim.  *Santos I*, 2016 WL 7077104, at *9-10.

> the questions asked must be limited to the content of the outside information and whether it reached the jury. . . We may also "determine—without asking the jurors anything further and emphatically without asking them what role the communication played in their thoughts or discussion— whether there is a reasonable possibility that the [outside information] altered their verdict."

*Santos I,* 2016 WL 7077104, at *8 (citations omitted).

## IV.    Testimony of Jurors at Evidentiary Hearing

Eleven of the jurors from the 2006 trial provided testimony to this Court over the course of three evidentiary hearings. (Docs. 97, 107, 111, 122, 126, 136). In advance of the hearings, the parties had an opportunity to propose and object to questions for the jurors. (Docs. 71, 81-85, 87-88, 90-91). Eight jurors who still resided in the Chicago area testified in person at the first hearing. (Docs. 97, 107).[7] Each juror testified separately and was not permitted to hear the testimony of any other juror. (*See* Doc. 107, at 8-9, 13-15). The three remaining jurors resided out of state and testified later by videoconference. (Docs. 111, 122, 126, 136).[8] Hearings were also held (and a motion for rule to show cause filed and withdrawn) in relation to documents subpoenaed from the Public Defender. (*See* Docs. 113, 126, 129, 132). Ultimately, apart from the jurors' testimony, the parties submitted no other new evidence beyond a few documents with minimal value that were attached as exhibits to their respective briefs.[9]

---

[7]    These eight jurors were: Erika Cuneen (Doc. 107, at 15-19, 80-83); Antoinette Woods (*id.* at 20-25, 83-85); Oswaldo De Leon (*id.* at 25-31, 85-89); Tasha Evans (*id.* at 31-36, 90-93); Gillise Murry (*id.* at 36-42, 93-95); Nancy Doheny (known as Nancy Richter at the time of the trial) (*id.* at 42-50, 95-97); John Ortiz (*id.* at 50-55, 97-99); and Linda Carson (*id.* at 55-74).

[8]    These three jurors were: David Majer (Doc. 122, at 6-21); Ronette Peterson (Doc. 136, at 7-20); and Hubert McFarland  (*Id.* at 24-37).

[9]    Santos submitted letters addressed to his current attorney with information from the trial court judge and the Cook County Sheriff's Office. (Docs. 145-4, 145-5). Respondent submitted the prosecutor's trial notes. (Doc. 154-1).

### A.    Testimony of Jurors Cuneen and Majer About Dictionary

Only two of the 11 jurors (Ms. Cuneen and Mr. Majer) remembered the dictionary, so their testimony is summarized in detail.

### 1.    Ms. Cuneen

Ms. Cuneen initially did not recall the jury requesting a dictionary.  (Doc. 107, at 16).  But later, when asked if she had a "memory of jurors looking up any words in a dictionary during deliberations[,]" she responded: "It was a long time ago.  I -- I do seem to recall -- yes, I do seem to recall that.  I couldn't tell you what. . . " (*Id.*).  She was not sure if a dictionary definition was ever read aloud in the jury room, and had no memory of herself reading from a dictionary.  (*Id.* at 17).  This exchange followed:

> Q. The record indicates that the jury left the courtroom to begin deliberating on the first day of deliberations at 6:35 p.m., and requested both a dictionary and a second set of verdict form[s] at some point that evening.  Does that refresh your memory at all on whether a dictionary was requested or verdict forms were requested, a second set of verdict forms?
>
> A. I don't remember the verdict forms.  I do have a slight memory of a dictionary being requested; yes.

(*Id.* at 17-18).  Other questioning, however, did not elicit any additional information on this topic.  (*Id.* 16-18).

### 2.    Mr. Majer

Mr. Majer was the only juror who provided detailed testimony about the dictionary. Santos relies heavily on that testimony (*see* Doc. 145, at 8-9, 19, 21, 24), while Respondent argues that Mr. Majer (and the other jurors) lacked a "reliable" memory. (Doc. 154, at 3).  As reflected below, Mr. Majer definitely recalled the dictionary being requested and received on the first day of the deliberations.  (*See* Doc. 122, at 6-9).

Q. And the criminal record in that case indicates that the jury deliberated over two days. It looks like they start deliberating perhaps early evening the first day and then they resumed deliberations the second day at about 11:00 a.m. before returning a verdict at about 12:15 p.m. My question to you is at any time during the deliberations in that case, did the jury ever request or receive a dictionary?

A. Yes.

Q. All right. And do you have any memory of whether that was on the first day of deliberations or the second day of deliberations?

A. First day.

Q. And do you know whether that request was made in writing or was it a verbal request to a bailiff or a guard or sheriff?

A. I believe it was verbal.

Q. Do you know who requested the dictionary?

A. I don't recall.

Q. And do you recall whether the dictionary was, in fact, delivered to the jury room?

A. I think it was. I think it was.

Q. And do you have any sense of about what time that might have happened?

A. I think it was midway through the deliberations. Maybe towards the end of it, maybe three and a quarter.

Q. On the first day?

A. Yes.

Q. Okay. And do you recall who delivered the dictionary?

A. I assume it was a bailey. I don't remember.

Q. And when the dictionary was delivered to the jury room, was the jury told anything either in writing or verbally about using that dictionary?

A. I don't think -- I would have to say no.

Q. Did the judge ever communicate with the jury in writing or verbally about the dictionary?

A. I would say no.

Q. Do you recall what the name of the dictionary was?

A. I remember it was a large book. I assume it was one of those Merriam-Webster unabridged.

Q. When you say you assume, I mean, I do need you to testify from your memory. So do you actually have a memory about, you know, the size, color?

A. Yes. Large and it was leather-bound. I did not look to see who the publisher was. It was just a large leather-bound, well-worn -- I think it was pretty well-worn -- dictionary.

Q. Do you remember a color?

A. It was dark -- medium brown.

Q. Do you remember any markings on it like a stamp or --

A. No.

Q. -- a name of a Property Of somebody?

A. No.

(*Id.*).

When asked how the dictionary was used, Mr. Majer was less certain, sometimes acknowledging that he could not recall or otherwise qualifying his statements. (*See id.* at 9-10).

Q. And do you recall what happened once the book was brought into the jury room? In other words, did somebody look up a word? How was it used?

A. I think someone looked up a word but I think it turned out to be --

Q. Hold on. Let me stop you for just a minute. So first question is: Do you recall if anybody looked up a word in that dictionary?

A. It's been some time. I would say yes.

Q. And do you have any memory of how many jurors actually looked at the book?

A. I'd have to qualify this. It has been some time. I would say probably a couple, maybe three.

Q. Did you look up any words?

A. I think yes.

Q. And do you recall what words were looked up in the dictionary?

A. I have to tell you, I don't remember the word.

Q. Did you -- were there more than one word looked up or was everybody -- the two or three people looking up the same word?

A. I think it was narrowed down to one word. And if my memory serves me right, it probably didn't make much difference at that point because we didn't get it immediately.

Q. All right. Let me stop you just because I have to be careful of what I can ask and what I can't ask.

A. Okay.

Q. So you think one particular word was looked up --

A. Yes.

Q. -- but you don't remember what the word was?

A. No.

(*Id.*).

Next, the Court probed Mr. Majer's memory as to whether the word that was looked up in the dictionary appeared in the jury instructions. (*Id.* at 10). He answered repeatedly that he could not recall this. (*Id.*). Thereafter, he was asked whether the dictionary definition had been read aloud in the jury room, to which he responded: "I would assume but I don't explicitly remember." (*Id.* at 10-11). Nor did Mr. Majer remember the definition that was viewed in the dictionary. (*Id.* at 11).

As for how long the dictionary was used by the jurors, Mr. Majer said for "a total of three minutes altogether" though it was available in the jury room for about two hours. (*Id.* at 11-12). Since Santos argues that Mr. Majer gave "conflicting information about whether the jury actually used the dictionary for two hours or a few minutes" (Doc. 145, at 24), the specific testimony on this point follows.

> Q. Okay. After the jury was -- or let me ask this: About how long was that dictionary in the jury room on the first day?
>
> A. I think it remained until we left and I do not recall it being there the next day.
>
> Q. And about how long was the jury actually -- whether it was you or other jurors but the combined time of looking at that dictionary?
>
> A. I would say an hour or two.
>
> Q. Say the answer again just so I make sure I heard.
>
> A. It could be -- I would say two hours.
>
> Q. Meaning two hours you're actually looking at the dictionary?

20

> A. It was available for that time period.
>
> Q. Okay. So my question is how much time actually looking at the word?
>
> A. Looking at it, I would say you're talking about a couple minutes.
>
> Q. A couple minutes by you or a couple minutes total of the two or three people?
>
> A. By both people looking. I think, like I said, maybe three -- some people looked at it and that might have been a total of three minutes altogether.

(Doc. 122, at 11-12).

Mr. Majer could not recall whether any jurors discussed what was viewed in the dictionary.

> Q: I asked you how long collectively you and the other jurors who looked at the dictionary spent looking at that dictionary. What I didn't ask is, was there time spent discussing what you had seen in the dictionary --
>
> A. I would assume --
>
> Q. -- after you looked it up? Go ahead.
>
> A. I don't recall.

(*Id.* at 12). Nor did he recall communications with the trial judge about the dictionary. (*Id.*).

Next, the Court questioned Mr. Majer about topics other than the dictionary; he was reminded that the jury had requested a second set of jury verdict forms, and he was asked whether he remembered this (he did not) or recalled requesting transcripts (he did not, but knew he had looked at transcripts at some point). (*Id.* at 12-14). After a short recess, questioning resumed, and, at the request of counsel for Santos, the Court again

asked about the verdict forms and this time read from them. (*Id.* at 14, 17-18).[10] But Mr.

Majer still did not recall the jury requesting new verdict forms. (*Id.* at 17-18). At that point,

just as he was being told there were no further questions, Mr. Majer interjected with the

following statement:

> I think I remember the name now, that word we were looking
> for . . . I think it was something to do with collaboration
> because it involved this person and someone else might have
> shot the person regarding this felony murder. We wanted to
> find a definition of what I think -- conspiracy, maybe it was
> conspiracy, or collusion or something like that. That was the
> definition we were looking for. And I might be wrong, it just
> shot into my mind but that might have been it.

(*Id.* at 19-20). During a recess immediately after this testimony, both parties said they

had no further questions for Mr. Majer. (*Id.* at 20).

## B. Testimony of Jurors Peterson and De Leon About Dictionary

Testimony of Ms. Peterson and Mr. De Leon is also summarized in some detail

because Santos asserts that these jurors offered reliable testimony on the jury's use of

the dictionary (Doc. 145, at 9-10), and Respondent disagrees. (Doc. 154, at 10).

### 1. Ms. Peterson

Ms. Peterson said she had no memory of a dictionary or of the jury requesting a

second set of verdict forms. (Doc. 136, at 8-9, 19-20). During a recess, counsel for

Santos requested that Ms. Peterson be asked if she recalled the jury seeking clarification

---

[10]     The Court told Mr. Majer what the verdict forms said as follows:

> . . . We, the jury, find that during the commission of the offense of first
> degree murder, the Defendant Carlos Santos was armed with a firearm
> and personally discharged a firearm; and then it's signed by the foreperson
> and each of the jurors under that. And I have another one that says: We,
> the jury, find the Defendant Carlos Santos of first degree murder; and
> again it's signed by everyone . . . .

(Doc. 122, at 18).

of specific terms such as collusion as a way to jog her memory based on Mr. Majer's testimony about such terms. (*Id.* at 10-15). While Respondent preferred an open-ended question that did not identify specific terms, the objection was not a "strong" one. (*Id.* at 12-13). After the recess, Ms. Peterson provided the following testimony (in relevant part).

> Q. Okay. And do you have a memory of the jury ever making a request for clarification on any of the terms, either in the jury instructions or other terms?
>
> A. I believe so.
>
> Q. And do you think it was a request for clarification on a term in the jury instructions or some other term?
>
> A. That I can't remember . . . .
>
> ***
>
> Q. All right. And do you recall if the jury ever requested clarification on the term about "first-degree murder," for example?
>
> A. I can't recall.
>
> Q. How about do you recall the jury ever requesting clarification on the term "collusion"?
>
> A. Maybe.
>
> Q. Do you recall the jury ever requesting clarification on the term "collaboration"?
>
> A. I'm not sure.
>
> Q. How about the term "conspiracy," do you recall the jury ever requesting clarification on the term "conspiracy"?
>
> A. I'm not sure.
>
> Q. All right. And do you recall -- you said on the word "collusion," maybe they did request the -- the jury maybe did request clarification on that term. Did the jury receive clarification on that term if they did it? I mean, you said maybe

so; maybe they did; maybe they didn't ask for it. So I'm asking you, though, do you have any memory of the jury receiving clarification on the term "collusion"?

A. I want to say if they did ask, they did get clarification.

Q. And do you have any memory of whether they did or not?

A. No, I don't know for sure.

Q. And do you recall, were you the one who requested clarification if clarification was requested on that term?

A. No.

(*Id.* at 15-17).

### 2.     Mr. De Leon

Santos asserts that Mr. De Leon "acknowledged a dictionary was in the jury room" on the second day of the deliberations. (Doc. 145, at 9). Respondent disagrees. (Doc. 154, at 3 n.1). The relevant testimony follows.

Q. All right. During your deliberations in that criminal case, did the jury request a dictionary on the first day of its deliberations?

A. No. No, I don't remember we -- we did.

Q. And as I'm asking you other questions, if it comes back to you and you do have a memory of a dictionary, let me know, because I have some other questions I'm going to ask you about a dictionary through my questions. Okay?

A. Okay.

Q. Do you have any memory of the judge in that case ever communicating in writing or verbally with the jury about a dictionary?

A. No, I don't have a memory about that.

Q. And do you have a memory of jurors ever looking up words in a dictionary?

24

A. No, I don't remember.

Q. Do you have any memory of any juror ever reading out loud a definition of a word from a dictionary?

A. No.

Q. The record in that criminal case indicates that the jury left the courtroom to begin deliberating on the first day of deliberations at 6:35 p.m., and requested both a dictionary and a second set of verdict forms at some point that evening. Do you have any memory of that?

A. No; but I have a question for what do you mean with that dictionary? It's a book?

Q. Right. A book that has words in it, and for each word it describes what the meaning is of that word.

A. No, I don't remember we -- we have a dictionary, I tell you.

Q. The record for that criminal case also indicates that the jury left the courtroom to begin deliberating on a second day of deliberations at 11:00 a.m., and returned a verdict to the judge at 12:15 p.m. on the second day. Do you have any memory of a dictionary ever being requested on the second day of the deliberations?

A. I don't remember we request a dictionary or they bring to us or...

Q. Do you have any memory of transcripts of witness testimony ever being requested or received by the jury during the deliberations?

A. Yes, I -- I remember they request that, you know.

(Doc. 107, 26-27).

Counsel for Santos had an opportunity to propose follow-up and clarifying questions of witnesses and frequently did so, including of Mr. De Leon. (*See, e.g., id.* at 28-29). Counsel did not, however, request any follow-up questions for Mr. De Leon

concerning the above testimony regarding the dictionary. (*See id.*). But Santos now construes the statement "I don't remember we request a dictionary or they bring to us" to mean that Mr. De Leon "clearly acknowledged a dictionary" but merely was unable to recall "the manner in which it was brought to the jury." (Doc. 162, at 5-6). While Mr. De Leon's command of the English language was far from perfect, this Court definitely understood Mr. De Leon during the hearing to say that he lacked any memory of a dictionary.

At Santos' request, Mr. De Leon and certain other jurors were called back to the witness stand a short time later for questions on another topic. (Doc. 107, at 74-99). According to Santos, Mr. De Leon testified at that time that during the deliberations, "a verbal request for clarification on first-degree murder was made." (Doc. 145, at 11, citing Doc. 107, at 88). But examination of the juror's testimony belies this.

> Q. Do you have any memory of whether the jury, during the deliberations, requested clarification on any of the jury instruction terms?
>
> A. No, I don't remember.
>
> Q. Okay. Do you have a memory of the jury requesting clarification on -- on anything during the deliberations?
>
> A. I do remember we make a -- questions about what means, first degree. But – that's all. This is just the only thing I remember.
>
> Q. So you remember questions about what . . .
>
> A. What first --
>
> Q. . . . what first degree means, is that what you said?
>
> A. Yes. Yes.

26

> Q. And when you say you had questions, are you talking about questions that were written down in a note to the judge?
>
> A. No.
>
> Q. Okay. Because I'm not asking you anything about what you discussed with other jurors. The only thing I am allowed to ask and want to know about is anything you communicated to someone who's not on the jury, whether that's to the judge in a note, or in open court. So I'm not asking you about what you discussed inside the jury room. So again, did you request clarification from the judge on anything, that you can remember?
>
> A. No, I don't remember to ask any clarification about anything else.

(Doc. 107, at 87-88). Following that testimony and at the request of Santos' counsel, the Court asked this final question: "Do you have any memory of the jury seeking clarification on anything from the bailiff or a sheriff or a court clerk, anybody who was not on the jury?" (*Id.* at 88-89). Mr. De Leon answered: "No, I don't remember." (*Id.*).

Despite this answer, Santos now asserts that Mr. De Leon's earlier "conditional answer ["No, I don't remember to ask any clarification about anything else."] may be understood that a verbal request for clarification on first-degree murder was made." (Doc. 145, at 11, citing Doc. 107, at 88). The Court disagrees. Rather, the Court understood Mr. De Leon to say that the jury did not seek clarification on that term from anyone who was not on the jury.

### C.  Testimony of Other Jurors Unrelated to Dictionary

While the remaining jurors lacked any memory of the dictionary, several recalled other jury requests and communications during the deliberations, and the Court explored this topic with them at the request of Santos.

27

Five jurors, for example, recalled requesting or receiving trial transcripts.[11]  Several jurors also remembered asking for clarification of something in the jury instructions, possibly through a note sent to the trial judge.[12]  This testimony is consistent with the record, which shows that the jury sent a note to the trial judge on the second day of deliberations asking for clarification of the verdict forms, and after discussing the issue, the parties agreed with the trial judge's proposal to direct the jury to read a specific jury instruction that had addressed the verdict forms.  (*See* Doc. 18-28, at 5-6).

As Ms. Murry recalled, there was a request on the second day of deliberations (possibly in a note) asking for "some type of paperwork," and a response that "pertained" to "the law or the ruling as the Court gave it to us, we were to go by that."  (Doc. 107, at 37-41).  Mr. McFarland similarly recalled a "brief" clarification of the jury instructions on the second day of deliberations that was "just the same thing that they told us at the beginning."  (Doc. 136, at 28-29, 32-33).  And Ms. Carson likewise recalled a note seeking clarification of something in the jury instructions that "had something to do with . . . the sentencing or -- or what we were supposed to decide on the charges . . . . "  (Doc. 107, at 60-62, 66).  Ms. Cuneen more generally recalled that the judge told them to "follow the letter of the law" and then either read or stated what that law was.  (*Id.* at 81-82).  Mr. McFarland believed the judge spoke to the jury personally in the courtroom or his chambers (Doc. 136, at 28), while Ms. Cuneen thought the conversation she described

---

[11]     Those jurors were: Mr. De Leon (Doc. 107, at 27-30); Ms. Evans (*id.* at 33); Ms. Doheny (*id.* at 43); Ms. Carson (*id.* at 56-57); and Mr. Majer (Doc. 122, at 13-14).

[12]     Those jurors were: Ms. Evans (Doc. 107, at 91-92); Ms. Murry (*id.* at 37-41, 95); Ms. Carson (*id.* at 60-62, 65-67, 73); and Mr. McFarland (Doc. 136, at 26-29).

occurred in the jury room. (Doc. 107, at 80-81). The other jurors had no recollection of these details.

## DISCUSSION

In light of Judge Aspen's prior rulings, the parties agree that the sole question to now be decided is whether the evidence demonstrates that Santos suffered actual prejudice. (Doc. 145, at 13; Doc. 154, at 1). Santos argues that actual prejudice arose from: the shifting of the burden of proof in these habeas proceedings; the jury's use of the dictionary during deliberations; the judge's *ex parte* communication with the jury about the dictionary; and several other alleged errors. (Doc. 145, at 13-29; Doc. 162, at 4-19). After setting forth the actual prejudice standard, each argument is addressed in turn.

## I. Actual Prejudice Standard

"Due to the concerns of federalism, finality, and comity that attend habeas proceedings, a habeas petitioner must show that a constitutional error was not harmless to succeed on his petition," and thus, "it is well established that a habeas petitioner must prove prejudice in order to have his petition granted[.]" *Hall*, 692 F.3d at 805-06. "More specifically, he must show that the constitutional error had a 'substantial and injurious effect' on the outcome of his case," which is, "in effect, an 'actual prejudice' test." *Id.* at 805 (quoting *Rodriguez v. Montgomery*, 594 F.3d 548, 551 (7th Cir. 2010); *Jones v. Basinger*, 635 F.3d 1030, 1052 (7th Cir.2011)); *see Santos II*, 2017 WL 2189102, at *8 (quoting *Brecht*, 507 U.S. at 623). This exacting standard (known as the "*Brecht* standard") "reflects the view that a 'State is not to be put to the arduous task of retrying a defendant based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error.'" *Santos II*, 2017

29

WL 2189102, at *8 (quoting *Davis v. Ayala*, 576 U.S. 257, 268 (2015)) (internal quotations omitted). When determining whether this standard has been met, however, it is enough if a habeas court has "grave doubt as to the harmlessness of an error that affects substantial rights." *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 445 (1995)).

## II.  Prejudice from Shifting of Burden of Proof

Santos first argues that he has demonstrated the requisite prejudice because the burden of proving prejudice has been shifted to him in this habeas proceeding. (Doc. 145, at 18) ("The fact that the hearing was delayed until a habeas proceeding where the burden has shifted to Santos, establishes prejudice from the state's unreasonable application of federal law because in the trial court, or after a direct appeal, the burden would have remained with the state pursuant to *Remmer*."). Santos cites no authority for this novel position, which would effectively nullify the actual prejudice requirement; habeas relief would be granted in every case in which a state court failed to hold a *Remmer* hearing, even absent any showing that the extraneous material had influenced the verdict. Santos' argument also flies in the face of the Seventh Circuit's teaching in *Hall*, which Judge Aspen quoted when denying Santos' motion to reconsider the allocation of the burden of proof, as follows:

> First, it is well established that a habeas petitioner must prove prejudice in order to have his petition granted, *see Brecht*, 507 U.S. at, 622, 113 S. Ct. [at 1713]; [*Jones v. Basinger*, 635 F.3d 1030, 1052 (7th Cir. 2011)], though *we recognize that this point may be counterintuitive given the constitutional error at issue, which is the state courts' failure to place the harmlessness burden on the government in a post-conviction hearing. As already noted, however, this is a consequence of the deference we afford state courts in collateral review.* Second, though it may be difficult to prove or disprove prejudice without the benefit of juror testimony regarding the effect of extraneous information on deliberations, it is an

> abdication of a court's duty to automatically consider the burden of proof to be dispositive in situations of this nature. *Thus, what is left for us to decide—if we can—is whether Hall has given us "grave doubt as to the harmlessness" of the Indiana courts' constitutional error. Basinger*, 635 F.3d at 1052 (quoting [*O'Neal v. McAninch*, 513 U.S. 432, 445, 115 S. Ct. 992, 999 (1995)]).

(*Santos III*, Doc. 76, at 4 (quoting *Hall*, 692 F.3d at 806) (emphasis in original)). Since habeas relief is warranted only if the constitutional errors had a substantial and injurious effect on the outcome of the case, the Court rejects Santos' argument that he has suffered actual prejudice because *Brecht* places the burden on him to show actual prejudice.

As will be seen, however, this shift in burden is not dispositive of Santos' claim since regardless of which side bears the burden, the evidence does not demonstrate that the jury's use of the dictionary and *ex parte* communications about the dictionary had a substantial and injurious effect on the verdict. Nor does the evidence leave this Court with a "grave doubt as to the harmlessness" of the errors. *See O'Neal*, 513 U.S. at 445. Instead examination of the record persuades this Court that prejudice is unlikely here and that Santos' theory of prejudice is unduly speculative.

## III. Prejudice from Jury's Use of Dictionary

Santos argues that he suffered actual prejudice because the jury used the dictionary to look up words that were important, differed from the jury instructions, and lowered the threshold for conviction. (*See* Doc. 145, at 18-23; Doc. 162, at 9-10, 13). Respondent disagrees, asserting that only two jurors even recalled the dictionary, and their "vague recollections" and testimony "provide[] no reason to think the dictionary played a role in the verdict." (Doc. 154, at 3).

### A. Dictionary Factors

31

The parties have not identified a case in this jurisdiction involving a claim of prejudice from a jury's improper use of a dictionary. Santos, however, directs the Court to *State v. Aguilar*, in which there is a helpful recitation of common sense factors to consider when evaluating prejudice flowing from a jury's use of a dictionary, including: (1) the importance of the word being defined to the resolution of the case; (2) the difference between the dictionary and legal definitions; (3) how the material was received by the jury, (4) the length of time it was available to the jury; (5) the extent to which the jury discussed and considered it; and (6) the timing of its introduction. 224 Ariz. 299, 301-02 (Ariz. Ct. App. 2010).[13]

In *Aguilar,* the jury foreman and a second juror researched and located multiple definitions of a term contained in the jury instructions and central to the case—"premeditation"—at least some of which were "significantly different" from the "carefully crafted instruction" required by the state supreme court. *Id.* at 300, 304-05. Even more troubling, the jury foreman also conducted a half-hour internet search at home on the offense charged—first degree murder—to locate definitions of both first and second degree murder that were also "contrary to Arizona law," and then printed the documents, brought them to the jury room the next day, and discussed them with the other jurors. *Id.* According to the decision, these definitions further "muddied the meaning of premeditation under Arizona law[;]" one was "worded so poorly it could only have confused the jury over the difference" between first and second degree murder; and

---

[13]     This Court has identified two federal habeas cases in which courts assessed prejudice stemming from a jury's use of a dictionary and applied similar factors, but engaged in less extensive discussion of them. *See Bauberger v. Haynes*, 632 F.3d 100, 105-09 (4th Cir. 2011); *Tedeschi v. Dexter*, No. 08CV0820-JLS(CAB), 2009 WL 4828741, at *9-18 (E.D. Cal. Dec. 9, 2009), *aff'd* 414 Fed. Appx. 88 (9th Cir. 2011).

another "described the crimes as being the same except for the penalties, a factor the [trial] court instructed the jury it was not to consider." *Id.* at 304-05.

While the prejudicial impact of the dictionary definitions at issue in *Aguilar* is readily apparent, the record also left no room for doubt on that point, as five jurors confirmed the jury's use of these definitions during their deliberations. *See id.* at 305-06. In addition to the foreman who "'considered' his own research, one juror "acknowledged the importance of the foreman's Internet definitions to her deliberation[;]" another admitted "he was confused about the definition of premeditation after the first day of deliberations, but after he looked up the definition of premeditation on the Internet it 'solidified [his] thinking'[;]" another "'felt that [the foreman's Internet definitions] helped [her] understand'[;]" and another testified that "the jury 'considered' the foreman's Internet definitions and the information about second degree murder was 'important'[.]" *Id.* at 306.

### B.   Jury's Use of Dictionary and Completion of Spoiled Verdict Forms

Tracking some of the factors applied in *Aguilar*, Santos attempts to string together a compelling narrative in support of his own claim of prejudice despite a far weaker record. He posits that a divided jury felt "consternation" over the issue of Santos' "accountability" for his codefendants' conduct, leading to a "struggle" to reach a verdict. (Doc. 145, at 18-19). But jurors then read the dictionary definition of a word (collaboration, collusion, or conspiracy) "related to culpability[,]" which "contributed to [jurors] changing their minds" and allowed them to reach a unanimous verdict "on an uncharged offense (conspiracy) or non-legal theory (collusion or collaboration)." (*Id.* at 13, 18-19, 22; Doc. 162, at 13). The problem with this theory is that it relies on rank speculation rather than facts and reasonable inferences.

To support his theory that jurors were struggling to reach a verdict due to the question of Santos' accountability and that the dictionary definition allowed them to reach agreement on that matter, Santos first points to the content of the spoiled verdict forms. (Doc. 145, at 6-7). He also emphasizes the timing of the delivery of the new verdict forms to the jury, which he says occurred "simultaneously [as] or within a short period of time [of]" the delivery of the dictionary. (*Id.* at 22). As an initial matter, the most that can be said about the timing of the delivery of the new verdict forms and the dictionary is that each was delivered at an unknown time within the first one and a half hours of deliberations. (*See* Doc. 18-31, at 239-40 ¶¶ 1-5). Recall that the jury began deliberating at 6:35 p.m. on September 26, 2006, and by 8:00 p.m. that day the attorneys had returned to the courtroom. (Doc. 18-27, at 196; Doc. 18-31, at 239-40 ¶¶ 1-2). They were then informed that the jury had requested and already received new verdict forms and a dictionary. (Doc. 18-31, at 239-40 ¶¶ 3-5). Whether these items were delivered separately or together (or closer to 6:35 p.m. or 8:00 p.m.) is unknown.

Even assuming the new verdict forms and dictionary were delivered together (or within a short time of each other), there still is no basis for inferring from the content of the spoiled verdict forms that the jury was struggling with the issue of accountability. As noted, the jury was given five verdict forms: two for the first degree murder charge (guilty and not guilty); and three relating to certain "additional facts[.]" (*See* Doc. 18-27, at 186-88). If Santos was found guilty of first degree murder, the jury was additionally to sign one of the three verdict forms regarding the additional facts, finding that: (1) those additional facts did not exist; (2) Santos was armed with a firearm; or (3) Santos was armed with a firearm and personally discharged it. (*Id.* at 187-88).

Examination of the spoiled verdict forms (maintained by the jury at the trial judge's direction) reflect that only eight of the 12 jurors signed any of the spoiled forms. (*See* Doc. 18-31, at 183-85, 194). One juror (Ms. Carson) inconsistently signed both the guilty and not guilty forms on the first degree murder charge. (*See id.* at 184-85). In addition to Ms. Carson, one other juror signed the not guilty verdict form, while five other jurors signed the guilty verdict form. (*See id.*) As for the third spoiled form finding that Santos was armed with a firearm during the commission of first degree murder, it was signed by five jurors. (*See id.* at 194).[14] This evidence reveals nothing about whether: (1) the jury was divided on the question of Santos' accountability as opposed to some other issue (or any issue for that matter—the spoiled verdict forms could reflect an early poll by the jury); and (2) the dictionary definition contributed to the jury overcoming the claimed division and reaching a verdict.

Santos' theory is unlikely when one considers the jurors' testimony as well as the timing of the verdict. Mr. Majer said that he and perhaps two other jurors looked at the dictionary definition for a total of three minutes on the first day of the deliberations. (Doc. 122, at 11-12). As noted, this was at an unknown time within the first hour and a half of

---

[14]    The three spoiled forms are as follows:

1)   "We, the jury, find the defendant Carlos Santos not guilty of first degree murder[,]" signed by two jurors: Ms. Carson, as foreperson; and Ms. Doheny.

2)   "We, the jury, find the defendant Carlos Santos guilty of first degree murder[,]"signed by six jurors: Ms. Carson, as foreperson; Mr. McFarland; Ms. Cuneen; Ms. Peterson; Michael Karas; and Ms. Evans.

3)   "We, the jury, find that during the commission of the offense of first degree murder, the defendant Carlos Santos was armed with a firearm[,]" signed by five jurors: Ms. Carson, as foreperson; Ms. Evans; Ms. Peterson; Ms. Cuneen; and Mr. De Leon. A large "X" appears over the signatures, and the word "VOID" is written at the bottom of the form above Ms. Carson's signature.

(Doc. 18-31, at 183-85, 194). Four jurors (Mr. Majer, Mr. Ortiz, Ms. Murry, and Ms. Woods) did not sign any of the spoiled verdict forms. (*Id.*).

the deliberations.  (*See* Doc. 18-27, at 196; Doc. 18-31, at 239-40 ¶¶ 1-2, 5; Doc. 122, at 6-9).  After the parties were informed of the jury receiving the dictionary, the deliberations continued for another hour and a half without a verdict.  (*See* 18-27, at 196; Doc. 18-31, at 239-40 ¶ 1-2, 5-6).  The jury then resumed deliberations the next day for another hour and 15 minutes before finally announcing a verdict.  (Doc. 18-28, at 5-8; *see* Doc. 18-31, at 181-182, 240 ¶ 7).

This timeline hardly allows an inference that the dictionary definition was instrumental to jurors changing their mind on an issue that had divided them.  *See Bauberger*, 632 F.3d at 108 (rejecting habeas petitioner's reliance on "the struggles the jury apparently had in reaching its decision" where "jurors heard the definitions only an hour into their deliberations" and "still needed an additional four hours before reaching a decision" and concluding: "This timeline tells us little about the issues around which the jurors' struggles revolved.  We are unwilling ultimately to put dispositive weight on a jury's ambiguous actions.  That would be altogether too speculative."); *see Tedeschi*, 2009 WL 4828741, at *14, 17 n.14, 18 (rejecting habeas petitioner's argument "based largely on speculation about the timing of the verdict rather than on objective evidence indicating the jury was actually influenced by the extrajudicial definition" and distinguishing: *Sassounian v. Roe*, 230 F.3d 1097, 1110 (9th Cir. 2000), where a jury deadlocked for 15 days reached a verdict one hour after receiving extraneous information; and *Marino v. Vasquez*, 812 F.2d 499, 506 (9th Cir. 1987), where "a juror changed his vote to guilty after holding out for nearly 30 days against a guilty verdict, evidencing a direct temporal and causal connection between extraneous evidence and a prejudicial result"); *see also Ervin v. Davis*, No. 00-CV-1228-LHK, 2016 WL 4705691, at *6 (N.D. Cal. Sept. 8, 2016)

36

(similarly distinguishing *Marino*, where "juror who received definition had held out against a guilty verdict for 28 days, but changed vote shortly after receiving definition").

### C.    Jurors' Memories

Santos' narrative about a divided jury using the dictionary definition to overcome a deadlock is also unlikely because so few jurors had any memory at all of the dictionary. If the dictionary definition indeed was the key to resolving a struggle among the jurors and "contributed to [jurors] changing their minds" so they could reach a verdict (Doc. 145, at 22; *see* Doc. 162, at 13), one would expect more jurors to remember the dictionary and even the definition that brought them to unanimity. After all, several jurors were able to remember other events during the deliberations, such as the requests for clarification of verdict forms and copies of witness transcripts. (*See* Background Section IV.A-C, *supra*, at 16-29).

Respondent argues that the jurors' memories are so bad that the Court should make a "factual finding that none of the jurors had a reliable memory of using the dictionary." (Doc. 154, at 3 (observing that nine of 11 jurors had no recollection of requesting or receiving a dictionary)). Santos disagrees and also contends that an additional two jurors (Ms. Peterson and Mr. De Leon) offered reliable testimony on the use of the dictionary. (*See* Doc. 145, at 9-10). This Court has already examined the testimony of Ms. Peterson and Mr. De Leon in detail, and neither offered testimony about the dictionary. (*See* Background Section IV.B, *supra*, at 22-27).

Ms. Cuneen was one of only two jurors who recalled the dictionary, and her testimony was indeed tentative. She said she "seem[ed] to recall" jurors looking up words in a dictionary and had a "slight memory of a dictionary being requested[,]" but was unable

to provide further information. (Doc. 107, at 16-18). The same cannot be said of Mr. Majer's testimony; he had a strong memory of the physical appearance of the dictionary and said that he was one of the jurors who examined it. (*See* Doc. 122, at 6-10). He also recalled when the dictionary definition was provided (the first day of deliberations) and how long some jurors examined the definition ("a total of three minutes altogether"). (*Id.* at 6-12). While he initially was unable to recall the word looked up, he later (just after the verdict form was read to him) gave the key testimony upon which Santos now relies:

> I think I remember the name now, that word we were looking for . . . I think it was something to do with collaboration because it involved this person and someone else might have shot the person regarding this felony murder. We wanted to find a definition of what I think -- conspiracy, maybe it was conspiracy, or collusion or something like that. That was the definition we were looking for. And I might be wrong, it just shot into my mind but that might have been it.

(*Id.* at 19-20).[15]

This Court declines Respondent's request for a "factual finding" that the memories of Mr. Majer and other jurors were unreliable and must be disregarded. Instead, based on Mr. Majer's testimony, the Court finds that some jurors spent a few minutes looking at the dictionary definition of a word (possibly collaboration, conspiracy, or collusion) at some point within the first hour and a half of deliberations. But for multiple reasons discussed here, it is unlikely that the jury's consideration of this extraneous material resulted in actual prejudice.

---

[15] Respondent notes that, after Mr. Majer said the jurors looked at the dictionary for a few minutes, he added "it probably didn't make much difference at that point because we didn't get it immediately." (Doc. 154, at 4, citing Doc. 122, at 9-12). Santos says this is an "improper argument" since Mr. Majer's testimony on this point was "unsolicited and involved the deliberations" so "was off limits under Rule 606." This Court agrees and therefore does not consider the quoted testimony. *See United States. v. Torres-Chavez,* 744 F.3d 988, 997-98 (7th Cir. 2014).

### D. Accountability

None of the words at issue—collaboration, conspiracy, or collusion—appeared in the jury instructions. Respondent thus concludes that Santos did not suffer prejudice because "[c]ourts have repeatedly held that no prejudice results when a jury uses a dictionary to look up a word that is not part of the instructions." (Doc. 154, at 5, citing *United States v. Aguirre*, 108 F.3d 1284, 1289 (10th Cir. 1997); *United States v. Williams-Davis*, 90 F.3d 490, 502-03 (D.C. Cir. 1996); *United States v. Steele*, 785 F.2d 743, 745, 747 (9th Cir. 1986)). But none of these cases announced that bright-line rule. Rather, the absence of the dictionary definition from the jury instructions was one of several factors considered when assessing prejudice from the totality of the circumstances. *See Aguirre*, 108 F.3d at 1285, 1288-90 (finding defendant not prejudiced by jury's use of dictionary); *Williams-Davis*, 90 F.3d at 502-03 (same); *Steele*, 785 F.2d at 744-49 (same).

Santos contends that the definition of the word collaboration, conspiracy, or collusion likely resulted in prejudice because it "directly related to a verdict" and was "critical to a determination of the facts, because accountability was a central theme in the case." (Doc. 145, at 18). As he sees it, the jurors likely focused so much on the dictionary definition that they disregarded the requirements for "attempt" in the jury instructions and convicted him "under a lesser standard than accountability." (*Id.* at 20).

To be sure, the jury was required to apply the instruction that identified the requirements to find Santos "legally responsible" for the conduct of others who were with him at the time of the shooting as well as other instructions that referenced the "legally responsible" term. For example, the jury was instructed that to sustain the charge of first degree murder, the State did not need to prove that it was the original intent of Santos or

one for whose conduct he is "legally responsible" to kill the decedent. (Doc. 18-27, at 173). It was sufficient if the jury found beyond a reasonable doubt that Santos and one for whose conduct he is legally responsible "combined" to commit residential burglary, aggravated kidnapping, or aggravated unlawful restraint and the decedent was killed "by one of the parties attempting to commit that unlawful act." (*Id.*).

Under the legal responsibility instruction that the jury was to apply, "[a] person is legally responsible for the conduct of any other person when, either before or during the commission of an offense and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid or attempts to aid the other person in the planning or commission of an offense." (*Id.* at 172). In closing argument, the prosecutor discussed the concept of legal responsibility and the applicable jury instruction, stressing how Santos and the others had acted together on the day of the shooting and so were all accountable for the decedent's death under the law. (*See id.* at 11-12, 16, 23-24, 26-46).

But Santos' suggestion that the jury was divided over the issue of accountability until the dictionary definition allowed them to overcome that division and reach a verdict is unsupported by the record. For one thing, Santos' lawyer never once mentioned the legal responsibility instruction and its requirements in his closing argument. (*See id.* at 46-112). Nor did he try to distance Santos from Lavelle and the others or suggest that they had not acted jointly on the day in question, but instead admitted this:

> . . . [Santos and his brother-in-law, Valencia] went over and enlisted the aid of some other sheriffs to try to go over to try to help them get the drugs, we already know that. We know when they arrived at the house that evening on May 3, 2003, we know that [Santos] had a gun, he already told you that.

40

> John Lavelle, one of the sheriffs, had a gun. Esteban Perkins,
> he had a gun. We're not trying to hide that . . . .

(*Id.* at 52).

Indeed, Santos testified on direct examination that he and Valencia had agreed to pay Lavelle and Perkins $5,000 to assist them in trying to collect the drug debt. (Doc. 18-24, at 69). Santos also testified that the men had met up and driven (in separate cars) to the Smith house. (*Id.* at 40-44). When they arrived, Santos took a gun from the glovebox. (*Id.* at 46, 123-24). As he, Lavelle and Perkins walked from their cars, Santos identified the Smith house, and they walked towards it. (*Id.* at 47 ("Q. When you got out of the car with the gun, did you see what John [Lavelle] and Perkins did? A. I walked towards the house and they got out from the car, I told him it's right here.")). Santos also testified that he saw that Lavelle had two guns and Perkins had one gun. (*Id.* at 48). When they reached the doorstep, Santos knocked on the door. (*Id.* 50-51).

What was hotly disputed by Santos at trial was not whether he and the others acted jointly that day in their endeavor to collect the drug debt, but rather what they planned to do if Smith refused to pay or was not home. (*See id.* at 14-15, 41-42, 75-76, 83-90). Santos testified at trial (and his lawyer argued to the jury) that the plan was merely to ask Smith to pay his drug debt, and Lavelle and Perkins were there to help collect the money. (*See id.* at 14, 36-38, 40-41, 43-44, 69-70, 84, 90; *see also* Doc. 18-27, at 52, 58-62, 73, 76-77, 82). Santos denied that the plan was to forcibly enter the house to search for money or drugs, or to kidnap and hold Smith until he or his family paid back the debt or returned the drugs. (Doc. 18-24, at 15, 32-33, 41, 75-76, 86, 89-90). Based on this testimony, Santos' counsel argued in closing that Santos could not be found guilty of first degree murder given the lack of intent to commit the underlying felonies. (Doc. 18-27, at

105 ("And if you don't believe that he was going over to that house to kidnap [Smith], or to break into that house or do anything or to unlawfully attempt to unlawfully restrain [Smith] or anyone else in that house, then he's not guilty of first degree murder.")).

But Santos' trial testimony on this point directly contradicted his earlier videotaped statement that was played to the jury, as well as testimony of ASA Buntinas and Detective Trahanas, who said Santos had also admitted the broader plan in earlier and unrecorded statements. (*See* Doc. 18-29, at 89-93, 123-124; Doc. 18-23, at 119). In the videotaped statement, Santos said the plan was "to go knock and see if James [Smith] was there. If James was there we were gonna take him. And then we were gonna make him call his, his friend or his family for him to give us the money or the drugs." (Doc. 18-17, at 20). If Smith did not want to go with them, Santos said "[t]hey were gonna take him by force." (*Id.*). Finally, if Smith was not home, "they were gonna go inside and they were gonna look for the money or the drugs." (*Id.* at 20-21).

Since Santos testified at trial that these videotaped statements were false (the product of undue police pressure) and there was never a plan to commit the underlying felonies (*see* Doc. 18-24, at 14-15, 32-33, 41-42, 80-90), the jury had to decide which of his versions of events to accept. Not surprisingly, closing arguments focused heavily on Santos' credibility and whether to believe what he said in the videotaped statement or what he said on the witness stand. Both sides acknowledged that Santos' guilt hinged on a plan to commit the charged felonies (*see* Doc. 18-27, at 96-99, 104-05, 159) and that it was up to the jury to decide the "credibility" of his claim that no such a plan had existed. (*Id.* at 103, 107-08, 132). Defense counsel argued Santos' live testimony should be believed. (*See id.* at 108 ("And the credibility of Carlos [Santos] based upon what you

seen on the tape, what you have seen of him on the witness stand, that's something that you're going to have to decide.")). The prosecutor, on the other hand, argued that Santos had a "motive to lie" and "something to gain by convincing you on the stand[,]" and the jury should instead credit the testimony of Detective Trahanas and ASA Buntinas. (*See id.* at 23-24, 120-121).

One thing the parties did *not* argue about was whether Santos, Lavelle, Perkins, and Valencia acted together—only whether their plan of action extended to the commission of the underlying felonies if necessary to collect the drug debt. Given this, Santos' claim of actual prejudice because the dictionary definition (of collaboration, collusion, or conspiracy) "directly related to a verdict" and was "critical to a determination of the facts, because accountability was a central theme in the case" (Doc. 145, at 18) is unpersuasive. As Respondent aptly notes:

> . . . the question for the jury was whether to believe [Santos'] trial testimony or his prior statements. Having conceded that the four men were working together under either scenario, the accountability instruction was not crucial to the question of guilt.

(Doc. 154, at 7).

And so too it is unlikely that the definition of the word collaborate, conspire, or collude was, as Santos suggests, the key to the jury resolving an alleged struggle over his accountability for others' actions. Santos' claim would be more plausible if the extraneous material related to Santos' credibility, for example, if jurors had been told by a bailiff that Santos was known to be a pathological liar. *See Tedeschi*, 2009 WL 4828741, at *15 n.11 (acknowledging respondent's argument that the underlying trial "was in essence a credibility contest," and thus "Petitioner was guilty of murder under any

definition of malice supplied by the parties" if his story was not believed, and similarly concluding that the malice instruction allegedly modified by the jury was not "crucial" in light of the arguments made by the defense at trial); *see also Bauberger*, 632 F.3d at 108 ("[I]f the evidence presented was such that the issue of malice was not likely a close one, it is less likely that the error [of using a dictionary to define the terms "recklessly" and "wantonly" which were used in the "malice" jury instruction] impacted the jury's decision").

### E.    Dictionary Definitions Compared to Jury Instructions

The speculative nature of Santos' claim of prejudice is even more evident when one examines on a granular level how he reaches the conclusions that the jurors' reading of the dictionary definition led to his being convicted "under a lesser standard than accountability" (Doc. 145, at 20), and that there is "substantial evidence that the jury convicted [him] on an uncharged offense (conspiracy) or non-legal theory (collusion or collaboration)."   (Doc. 162, at 13).   Santos' explanation begins with the dictionary definitions for the three words potentially examined by some jurors.

- Collaborate:    "to work jointly with others or together especially in an intellectual endeavor"; "to cooperate with an agency or instrumentality with which one is not immediately connected"

- Collusion:    "secret agreement or cooperation especially for an illegal or deceitful purpose"

- Conspire:    "to join in a secret agreement to do an unlawful or wrongful act or an act which becomes unlawful as a result of the secret agreement" or "to act in harmony toward a common end"

(Doc. 145, at 19-20, citing "Merriam-Webster.com (6 October 2018)").[16]

---

[16]    We do not know the publisher (or year) of the dictionary used by the jury during the trial in 2006, but there is no reason to believe the definitions of these three words that Santos provides (from a Merriam-Webster online dictionary) have materially changed over the intervening years.   It should be noted, however, that Santos purports to cite definitions of the nouns "collaboration" and "conspiracy," but the definitions referenced in his brief are those of the verbs "collaborate" and "conspire."   The Merriam-Webster online dictionary defines "conspiracy" as "the act of conspiring together[,]" "an agreement among

Santos claims that the definitions of these words "directly contradict the accountability instruction." (Doc. 145, at 28). Undoubtedly, the short and general definition of each of these words is *different* than the much longer jury instruction that describes the requirements for finding a person "legally responsible" for another's conduct (i.e., "either before or during the commission of an offense and with the intent to promote or facilitate" it, the person "knowingly solicits, aids, abets, agrees to aid or attempts to aid the other person in the planning or commission of an offense."). (Doc. 18-27, at 172). But to be directly contradictory, the dictionary definition would need to define the term "legal responsibility" in a way that is contrary to the jury instruction. Were that so, application of the dictionary definition would lead to the conclusion that a person *was* legally responsible, while application of the jury instruction would lead to the opposite conclusion.

This is not the situation here. Even assuming some jurors focused, for example, on the definition of the word "collaboration" and thus considered whether Santos had worked jointly with the other participants, this did not foreclose the jurors from following the jury instructions and insisting that the evidence also establish that Santos was legally responsible for the crimes. It is therefore speculative to conclude, as Santos does, that the jurors would have focused so much on the definition of collaboration that they "dilute[d] the instruction on accountability" and convicted him simply for working jointly with the others. (Doc. 145, at 19).

---

conspirators[,]" or "a group of conspirators[.]" MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/conspiracy (last visited August 11, 2020). The Merriam-Webster online dictionary does not contain a definition of collaboration and instead redirects the search to the definition of collaborate. (MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/collaboration (last visited August 11, 2020).

Santos' alternative theory for how he suffered prejudice is more circuitous and similarly unpersuasive. He posits that the dictionary word may have been collusion or conspiracy, describing these as "synonymous" terms. (Doc. 145, at 19). He then points out that the dictionary definition of conspiracy is not the same as the jury instruction for conspiracy. (*Id.* at 20*,* citing Ill. Pattern Jury Instr.–Criminal 6.03 Definition Of Conspiracy—Other Than Certain Drug Conspiracies). Acknowledging that Santos was not charged with conspiracy (so the jury never saw a conspiracy instruction), Santos nonetheless highlights the differences between the Illinois Pattern conspiracy instruction (requiring an act in furtherance) and the attempt instruction that *was* given to the jury (requiring a substantial step). (*Id.*) He then concludes that the jury may have disregarded the attempt instruction's substantial step element and convicted him merely for "[p]lanning an offense [which] may be a sufficient act for conspiracy, but falls short of an attempt to commit kidnapping, burglary or unlawful restraint." (*Id.*)

Again, this theory is not only speculative but unlikely. Assuming some jurors focused on the dictionary definition of collusion or conspiracy (so considered whether the evidence showed Santos had a secret agreement with others to commit an unlawful act), there is no reason they could not also have applied the attempt instruction and insisted on evidence that Santos took a substantial step toward the commission of one of the underlying felony offenses. During closing argument, both sides discussed the attempt instruction and whether the evidence demonstrated that a substantial step had been taken. (Doc. 18-27, at 33-35, 39, 44, 74, 104). This makes it even more unlikely that jurors would have disregarded the substantial step requirement in the attempt instruction and substituted a dictionary definition for a wholly different word and concept.

As always, "[a] jury is presumed to follow its instructions."  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *see also Steele*, 785 F.2d at 748 ("Absent some indication to the contrary, we must assume the jury followed the judge's instructions.").  Even before the trial began, the judge warned the jury:

> When the time for giving instructions is upon us, I will read them to you and you will get them in writing along with the verdict forms for your consideration.  You must follow the law as I give it to you.  You may not use your own idea of what the law should be.

(Doc. 18-22, at 47).  The instructions later read to the jury and provided for their use during deliberations repeated this admonition: "The law that applies to this case is stated in these instructions, and it is your duty to follow all of them.  You must not single out certain instructions and disregard others."  (Doc. 18-27, at 160).  Those instructions also made clear that jury was required to determine the facts "only from the evidence in this case[,]" and that the evidence "consists only of the testimony of the witnesses and exhibits which the Court has received."  (*Id.* at 160-61).

### F.    Other Cases Relied Upon by Santos

To advance his claim of actual prejudice, Santos relies on three habeas cases decided by the Seventh Circuit, none of which involved a jury's consideration of a dictionary definition: *Moore v. Knight*, 368 F.3d 936 (7th Cir. 2004); *Wisehart v. Davis*, 408 F.3d 321 (7th Cir. 2005); and *Hall v. Zenk*, 692 F.3d 793 (7th Cir. 2012).  Close review of these cases demonstrates why that they do not support granting Santos habeas relief.

#### 1.    *Moore v. Knight*

Perhaps recognizing the dearth of evidence of actual prejudice, Santos argues that "erosion of memory and destruction of evidence does not preclude granting a writ of

habeas corpus," and thus "scant and ambiguous evidence" can satisfy his burden to demonstrate the prejudice required by the AEDPA. (Doc. 145, at 16; Doc. 162, at 6). But his authority for this proposition, *Moore*, involved very different facts. There, the trial judge (without consulting the parties) provided answers through the bailiff to the jury's factual questions about the defendant's alibi defense, and those answers quite possibly gave inaccurate substantive information going "to the heart" of that defense. *Moore*, 368 F.3d 938, 941.

Unlike in this case, the state court in *Moore* held a post-conviction hearing to determine what the jury was told and assess prejudice, but the Seventh Circuit found fault with that hearing on multiple levels. *Id.* at 941-44. Among other problems, the state court heard testimony from only three jurors (two others submitted affidavits) despite the lack of consensus on the substance of the judge's answers to the jury's questions. *Id.* at 942. Significantly, two jurors said "they were told the answer to their question was not part of the testimony given at trial" which would have been incorrect and so undermined the alibi defense. *Id.* at 941-42. As the Seventh Court remarked, "it takes little imagination to see why . . . that response could have affected the outcome of the trial." *Id.* at 941.

*Moore* is also distinguishable because the state court was required to apply a presumption of prejudice and failed to do so. *Id.* at 942-43. The Seventh Circuit found that the "sparse" and "ambiguous" hearing evidence not only failed to support the factual findings that led to the harmless error determination, but "it certainly is not strong enough to meet the government's heavy burden necessary to overcome the presumption of prejudice." *Id.* Under all the circumstances presented, the Seventh Circuit held that the

writ should be granted unless the state elected to retry the defendant. *Id.* at 937-38, 944.[17]

### 2. *Wisehart v. Davis*

*Wisehart* is also unhelpful to Santos. There, a juror learned during the state criminal case that court would not be held one day because the defendant was about to take a polygraph test, after which the trial continued, possibly leaving her to assume the polygraph results were incriminating. *Wisehart*, 408 F.3d at 326-27. The Seventh Circuit acknowledged that *Remmer* requires at least some hearing where an extraneous jury communication is "of a character that creates a reasonable suspicion that further inquiry is necessary to determine whether the defendant was deprived of his right to an impartial jury[;]" and the court concluded that the information was "bad enough to require a hearing, however abbreviated, to determine what impact the news that he had taken the test had on the jury[,]" but noted that the state court "failed to apply this test or any reasonable variant of it." *Id.*

Contrary to Santos' suggestion (*see* Doc. 145, at 16-17), however, that error alone in *Wisehart* did not require the defendant's conviction to be vacated. Rather, the Seventh Circuit allowed the state the option to release or retry him, *or* to "conduct a further postconviction hearing addressed to the issue of jury bias." *Id.* at 328. Consistent with

---

[17] Santos also relies on *Parker v. Gladden*, 385 U.S. 363 (1966), and *U.S. v. Bensinger*, 492 F.2d 232 (7th Cir. 1974), in which bailiffs had *ex parte* communications with the jury. (Doc. 145, at 16, 21). In *Parker*, a bailiff told a juror in the presence of other jurors "Oh that wicked fellow (petitioner), he is guilty," and that the Supreme Court "will correct" any mistaken guilty verdict, after which at least one juror admitted that she had been prejudiced by these remarks. 385 U.S. at 470-71. And in *Bensinger*, a bailiff repeatedly responded to a jury's inquiries about the consequences of not reaching a verdict by stating that they "must reach a decision[,]" without the authorization of the trial judge and without advising that no juror was required to relinquish his or her conscientiously held belief to join in a majority verdict, and one juror admitted to being prejudiced by these statements and another stated that other jurors were prejudiced. 492 F.2d at 236-38. Again, the record here contains no such inflammatory remarks and no indication that any dictionary definition played a role in the jury's verdict.

*Wisehart*, Judge Aspen ordered the same inquiry here and assigned that task to this Court. But while the extraneous communication with Santos' jury was sufficient to require that inquiry at the outset, the results of that inquiry are now in hand and do not support Santos' claim of prejudice.

### 3. *Hall v. Zenk*

Santos last attempts to liken his case to *Hall*. (*See* Doc. 145, at 14-16). Santos argues that there the petitioner managed to establish prejudice even though "juror affidavits and testimony provided only a 'dearth of information upon which to rule[,]'" and here he has similarly "established prejudice" even though "under the prohibitions of Rule 606, there is nothing more [Santos] could obtain from the jurors regarding the effect of the extraneous information during deliberations." (Doc. 162, at 8-9). But the premise is inaccurate and misses much of *Hall's* point.

While the Seventh Circuit found the extraneous information in *Hall* "highly prejudicial" (the jury learned during deliberations that a juror's son, who was in prison with the defendant, and several other fellow inmates believed he was guilty), the court was nevertheless "uncertain as to whether he was actually prejudiced by the state courts' constitutional error" in failing to grant the defendant a presumption of prejudice under *Remmer*. *Hall*, 692 F.3d at 795, 798, 805-07. The court of appeals therefore reversed the district court's grant of the habeas petition and remanded for further proceedings, where the state would "have an opportunity to show, despite the strong evidence of prejudice already presented by Hall, that countervailing facts would have alleviated concerns of a prejudiced jury." *Id.* at 807.

*Hall* thus teaches that "strong evidence of prejudice" may be found in "the nature of the extraneous information" that reached the jury even though "juror testimony regarding the effect of extraneous information on deliberations" is off limits. *Id.* at 806-07. And so it was the "highly prejudicial" nature of the information that reached the defendant's jury in *Hall* that caused the Seventh Circuit to find "strong evidence of prejudice," though it stopped short of finding "actual prejudice" before allowing the state an opportunity to address this. *Id.* Once again, the jury contacts at issue here are not remotely similar since the information viewed was far from inflammatory or prejudicial on its face.

## G.    Strength of the Evidence

In assessing whether the dictionary definition had a "substantial and injurious effect" on the verdict, this Court may also consider "the strength of the legitimate evidence presented by the State." *Hall*, 692 F.3d at 807; *Santos I*, 2016 WL 7077104, at *8. The stronger the evidence, the less likely the jury's use of the dictionary impacted the verdict. *See Bauberger*, 632 F.3d at 108 ("While we are not analyzing Bauberger's conviction for the sufficiency of the evidence, such compelling evidence of malice makes it considerably less likely that the dictionary use affected the jury's ultimate decision."). Unfortunately, the parties barely scratch the surface in their respective descriptions of the evidence presented at trial, which was summarized at length in the order denying the direct appeal. (Doc. 18-1, at 2-8).

In a cursory fashion, Respondent observes that "the state trial court" described the evidence as "overwhelming" when it granted the state's motion to dismiss Santos' petition for post-conviction relief. (Doc. 154, at 6, citing Doc. 18-34, at 109). In a few sentences,

Respondent then highlights the key facts and Santos' confession, describing Santos as not credible and his defense as "feeble[.]" (*Id.* at 6-7, citing Doc. 18-1, at 4-7). Santos, on the other hand, observes that the evidence was "not overwhelming" and describes how he went to the Smith house only to collect a drug debt and "utilized . . . [Lavelle and Perkins] in an attempt to collect the debt." (Doc. 145, at 24). He argues that his own trial testimony on this point "was supported by the lack of any planning regarding the underlying felonies." (*Id.* at 25). Santos then concludes that the "lack of overwhelming evidence and curative instructions does not overcome the prejudice established by Santos." (*Id.*).

In this Court's view, the evidence against Santos was strong, particularly given his admissions in the videotaped statement (and in earlier unrecorded statements to both ASA Buntinas and Detective Trahanas) that the men planned to do more than walk away if Smith refused to pay or was not at home. (*See* Background Section I.A, *supra*, at 6-10). In the face of that evidence, it was paramount that Santos be a strong and credible witness before the jury when disavowing his prior videotaped statements and accusing the police officers and ASA Buntinas of misconduct and false trial testimony. Both sides devoted significant time in closing arguments to addressing the witnesses' credibility and marshalling the evidence that supported their respective positions. (*See generally* Doc. 18-27, at 10-159). Had the jury believed Santos' trial testimony and found that he and the other men never planned to commit the underlying felonies, then as Santos' attorney argued in closing, Santos could not be found guilty of first degree murder. (*Id.* at 105). Unfortunately for Santos, the jury apparently believed his pre-trial statements about the plan to commit the underlying felonies and not his trial testimony disavowing those

statements. Given the lack of any apparent connection between the jury's credibility determination and the dictionary definition, as well as the ample legitimate evidence that supported the verdict, the Court concludes that the strength of the evidence diminishes the likelihood of prejudice from the errors.

### H. Lack of Curative Instructions

In assessing whether Santos suffered actual prejudice, this Court may also consider "the power of any curative instructions at trial[.]" *Santos I,* 2016 WL 7077104, at *8. Here, no curative instruction was given. While Santos' counsel requested that the dictionary not be given back to the jury on the second day of deliberations (Doc. 18-31, at 240 ¶¶ 6, 7), he did not request or receive any curative instruction. (*See* Doc. 145, at 24; Doc. 154, at 8; Doc. 162, at 13).

Respondent argues that "there is no reason to infer prejudice based on the lack of an instruction that [Santos] did not see fit to request at the time of trial." (Doc. 154, at 8). Respondent also notes that the trial judge instructed the jury to apply the law as laid out in the instructions, so the jury would not have disregarded instructions based on the dictionary definition. (*See id.* at 6, 8). Santos dismisses the failure to request a curative instruction, theorizing that "it would have been unlikely [that he would have been granted one] given the judge is the one who provided the dictionary and did not believe he erred in any manner." (Doc. 162, at 13).

Any likelihood of being denied relief does not excuse the failure to request a curative instruction and preserve the record on that point. Regardless, the ultimate question is whether Santos has shown from the evidence that the jury's use of the dictionary had "a substantial and injurious effect" on the outcome of the verdict, *Brecht*,

507 U.S. at 623, or that there is a "grave doubt as to the harmlessness of an error that affects substantial rights[.]" *O'Neal*, 513 U.S. at 445. For reasons already discussed, this Court has determined that Santos has not done so. Therefore, the lack of a curative instruction to counteract any prejudice does not lead to a different result.

## IV. Prejudice from Judge's *Ex Parte* Communication with Jury about Dictionary

Little discussion is needed of Santos' claim that he suffered actual prejudice from the trial judge's *ex parte* communications with the jury about the dictionary. Santos observes that these *ex parte* communications prevented him from objecting to the jury receiving the dictionary and seeking clarification of the terms the jury sought to define, and these failures allowed the jury to look up a word that "directly contradict[s] the accountability instruction." (Doc. 145, at 26-29). But as noted, Santos has not demonstrated actual prejudice from the jury's use of the dictionary. The question now is whether *ex parte* communications about that dictionary (not its use) caused actual prejudice.

On that point, Santos asserts that *ex parte* communications about the dictionary and other topics "leave[ ] little confidence in the constitutional fairness of the jury deliberations and the verdict." (*Id.* at 29). Santos also directs the Court to *United States v. Smith*, 31 F.3d 469 (7th Cir. 1994) (Doc. 145, at 26), a case distinguishable on both the facts and law. In that direct appeal, the court found that the trial judge had violated Federal Rule of Criminal Procedure 43(a) by having private meetings with the jury that "did not deal merely with housekeeping matters but rather touched on a fundamental issue—whether the jury had concluded before the submission of all the evidence that the defendant was guilty." *Smith*, 31 F.3d at 473. Remand for a new trial was ordered "[g]iven

the fundamental issue at stake and the fact that neither the judge's communications with the jury nor his private jury instructions are available for review, [so] we cannot say that the record 'completely negatives any possibility of prejudice' to [the defendant]." *Id.* at 473-74.

Here, the evidence indicates that the *ex parte* communications about the dictionary involved nothing more than the jury sending a note asking for a dictionary, and the judge causing one to be delivered in response. This was how the trial judge described the dictionary communications (Doc. 18-28, at 44-45), and no juror testified about anything beyond this. Santos has not come close to demonstrating that these *ex parte* communications about the dictionary had a substantial and injurious influence on the verdict.

## V. Prejudice from Other Alleged Errors

As Santos acknowledges (Doc. 145, at 28), this Court's review was limited to the trial judge's *ex parte* communication with the jury concerning the dictionary. *Santos I*, 2016 WL 7077104, at *8, 10; *Santos II*, 2017 WL 2189102, at *1, 8. During the hearing before this Court, however, Santos proposed questions for the jurors regarding other potential communications with the trial judge, and these were largely allowed without objection. Based on the jurors' testimony about such communications, in his opening brief, Santos argues:

> The recent hearing made clear that there were several requests for items – dictionary, transcripts, and clarification of a legal term. At no time was Santos present for any of these questions depicting a pattern by the court to communicate with jurors outside of Santos's presence.

(Doc. 145, at 28). Santos also identifies (in a single sentence and without record citations) other alleged errors of the trial judge that he says "display a pattern" of improper contacts and then summarily asserts that he suffered prejudice because the errors rendered the jury "free to construct and supplement definitions of legal terms." (*Id.* at 28-29).

Respondent agrees that the trial judge communicated with the jury not only about the dictionary, but also about the jury's requests for new verdict forms (and clarification of the verdict forms) and for trial transcripts. (Doc. 154, at 8-11). Discussing the communications about each request at length (with citations to the record), Respondent argues that the contacts were proper and did not cause prejudice. (*Id.* at 8-12). In his reply brief, Santos elaborates on his arguments (this time with citations to the record), asserting that the collective contacts rendered the jury deliberations and verdict unfair. (Doc. 162, 14-19).

As a preliminary matter, neither side has addressed whether these additional alleged errors are properly raised in these proceedings. Since these errors were not identified in the habeas petition, Judge Aspen had no opportunity to consider whether Santos exhausted his state court remedies as required under 28 U.S.C. § 2254(b)(1)(A), and if so, whether these were constitutional errors that would warrant habeas relief if they caused actual prejudice. As noted below, to the extent an error occurred, it appears that Santos could have raised the issue before the state court but did not do so, perhaps because the communication was deemed of little significance. And in any event, Santos fails to demonstrate that these alleged errors had a substantial and injurious influence on the verdict.

The record reasonably suggests communications between the trial judge and the jury on only three topics other than the dictionary, namely, the jury's requests for: (1) new verdict forms; (2) clarification of the verdict forms it needed to sign; and (3) trial transcripts. (*See* Doc. 154, at 8-11).  Turning first to the new verdict forms, Santos' counsel learned of the jury requesting these (and the judge providing them) at the same time he learned about the dictionary—approximately 8:00 p.m. on the first day of the deliberations.  (Doc. 18-31, at 239-40 ¶¶ 1-5).  Indeed in a post-trial motion, Santos sought a new trial based in part on the *ex parte* communication about these replacement verdict forms.  (*Id.* at 244 ¶¶ 31-33).  Santos not only could have raised this issue on direct appeal, but he could have sought a hearing to question jurors about their communications with the trial judge on this topic.  Putting to the side this procedural problem, Santos fails to explain how the jury's receipt of replacement verdict forms upon request, and midway through the first day of deliberations (albeit without prior notice to Santos), plausibly resulted in actual prejudice.

As for the jury's request for clarification of the verdict forms, Santos' attorney and the prosecutor learned of this when the judge read them the jury's note seeking that clarification.  (Doc. 18-28, at 5).  And the judge then sought and received the parties' agreement to respond by directing the jury to the pertinent jury instruction discussing the verdict forms.  (*Id.* at 5-6).  Santos now speculates that perhaps the trial judge ran "afoul of the agreed response" since the record does not indicate whether the response to the jury was written or verbal.  (Doc. 162, at 14).  Of course, if the response was given verbally and outside the presence of the parties, Santos' attorney would have known this and could have raised the issue on appeal and sought to question the jurors about the *ex*

*parte* verbal communications if there were any. Despite having failed to do so, Santos now argues that if a verbal response was given, the judge "went beyond the agreed language as at least one juror testified that [the judge] told them they must follow 'the letter of the law.'" (*Id.*).[18] As before, even if this issue were properly raised at this juncture, Santos fails to explain how the judge's potential statement to the jury referring them back to the jury instruction or telling them to follow the letter of the law would have had a substantial and injurious influence on the verdict.

Finally, Santos complains of *ex parte* communications in which the jury requested and received trial transcripts, but again appears not to have raised this issue in the state court. While it is perhaps possible that Santos' trial counsel never learned during the trial of the jury's receipt of transcripts, this seems unlikely and Santos has never alleged this.[19] If Santos' attorney learned of the transcripts after the trial, he still could have raised the issue on appeal and requested a hearing to learn the content of the *ex parte* communications about the request for jury transcripts but did not do so. Regardless,

---

[18]    Santos relies on testimony of Ms. Cuneen, who recalled the judge speaking with the jury in the jury room where "he made a point of saying that we had to follow the letter of the law" and he either "read what that law was" or "stated what the law was." (Doc. 107, at 81-82). Elsewhere, Santos quotes testimony of Ms. Carson, concluding from her answer to a compound question that she too "remembered the judge speaking with the jury[.]" (Doc. 162, at 16). What Santos omits is Ms. Carson's answer to the follow-up question that Santos requested in order to clarify her answer. When asked if she had a memory of the judge speaking with the jury, Ms. Carson responded: "No." (Doc. 107, at 73). Testimony of other jurors on the topic of the clarification of the verdict forms is summarized at length. (*See* Background Section IV.A-C, *supra*, at 16-29).

[19]    Had Santos claimed he was unaware of the jury requesting trial transcripts, Respondent says it would have pointed to the prosecutor's trial notes. (Doc. 154, at 11 n.8). Those notes indicate that at 9:10 p.m. on the first day of deliberations, the jury asked for transcripts of the testimony of Santos and Detective Trahanas, and "[b]oth sides agree[d] to give transcripts." (Doc. 154-1, at 3). Santos asserts the prosecutor's notes are "irrelevant as one party's trial notes are not equivalent to an official court record" (Doc. 162, at 17), but he likewise submitted materials to this Court that were not part of the official court record. (*See* Docs. 145-4, 145-5). This Court need not resolve the issue since its ruling is not dependent on the content of the prosecutor's notes.

Santos once again is unable to explain how these particular communications plausibly resulted in actual prejudice.

In sum, Santos has not demonstrated from the hearing evidence that the jury's exposure to the dictionary definition, or the *ex parte* communications between judge and jury about the dictionary (or the other topics), had a substantial and injurious effect on the jury's verdict. *See Brecht*, 507 U.S. at 623. Nor does this Court have a "grave doubt as to the harmlessness" of the errors under the facts and circumstances here. *See O'Neal*, 513 U.S. at 445.

## **CONCLUSION**

For the reasons stated above, this Court recommends that Petitioner Carlos Santos' request for a writ of habeas corpus (Doc. 1) be denied. Pursuant to Fed. R. Civ. P. 72(b), specific written objections to this Report and Recommendation may be served and filed within fourteen (14) days from the date that this Order is served. Failure to file objections with the Honorable Marvin E. Aspen within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the Report and Recommendation.

ENTER:

Dated: August 11, 2020

SHEILA FINNEGAN